ALBERTSON'S, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Albertson's, Inc. v. Commissioner
Docket No. 10439-87.
United States Tax Court
T.C. Memo 1988-582; 1988 Tax Ct. Memo LEXIS 611; 56 T.C.M. (CCH) 928; T.C.M. (RIA) 88582; December 27, 1988; As amended January 5, 1989 Robert S. Erikson, Edwin V. Apel, Jr., Cathy R. Silak, and David A. Channer, for the petitioner. Joyce Britt, Julia Dewey, and Virginia Draper, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined a deficiency of $ 718,936 in Federal income tax for petitioner's taxable year ending February 3, 1983. The issue for decision is whether central heating, ventilating, and air-conditioning systems *612 installed by petitioner in thirty-three of its stores qualified as section 38[1] property for investment tax credit purposes. [2]
FINDINGS OF FACT Some of the facts have been stipulated. The facts set forth in the stipulations and attached exhibits are incorporated herein by this reference. Petitioner, an accrual basis taxpayer, was a Delaware corporation operating over 400 retail food and drug stores throughout the western, southern, and southeastern regions of the United States during the year at issue. Petitioner's principal place of business at the time the petition herein was filed was in Boise, Idaho. During the fiscal year ending February 3, 1983, petitioner purchased and installed heating, ventilating and air-conditioning (HVAC) systems in 13 of its remodeled, and 20 of its *613 new, retail food stores. Each of the HVAC systems at issue consisted of a central air handler, compressor, condensor, cooling coils and heat reclaim coils, all of which were connected to a system of duct-work and diffusers. Petitioner's HVAC systems operated 24 hours a day, including hours its stores were closed to customers and employees. In order for petitioner to achieve high volume sales and to remain competitive with other retail food stores, petitioner sold refrigerated and frozen food products in all of its retail food stores, and used computerized checkout systems [3] at many of its stores. In fact, because of competition from other retail food stores, if petitioner did not have refrigerated food cases and, thereby, have available for sale its refrigerated food products, petitioner would have been out of business in a short period of time. Petitioner displayed the majority of its refrigerated and, frozen food products in open-front, as opposed to closed, refrigerated food cases. [4] Petitioner's open-front cases were located throughout each store and its computerized checkout systems were located at its checkout counters. *614 Manufacturers designed their cases to operate properly in stores where temperature and relative humidity were strictly maintained according to certain specifications. All of the manufacturers' specifications for the cases used by petitioner recommended an ambient store environment at or below 75 degrees Fahrenheit and at or below 55 percent relative humidity. No cases were available which had lower environmental specifications. The manufacturers of petitioner's computerized checkout systems recommended specifications for an ambient store environment of 50 to 104 degrees Fahrenheit and 5 to 90 percent relative humidity. Historically, retail food stores, such as those owned by petitioner, developed a need for HVAC systems with the development and installation of open-front refrigerated food cases. As open-front cases began to proliferate throughout the retail food industry, it was discovered that there was an interaction between a store's environment, the functioning of open-front cases, and the refrigerated environment within open-front cases. Icing of coils in open-front cases occurred when the relative humidity within the store increased above a certain level. Icing of coils *615 was a problem that affected the proper mechanical functioning of open-front cases, which in turn caused spoilage. Moreover, it also became apparent that the quality of food displayed in open-front cases could also be adversely affected if a retail food store's ambient temperature became too high, even if the open-front cases themselves did not malfunction due to icing. Increased ambient store temperatures and relative humidity levels can affect food quality by causing shelf life of refrigerated food products in open-front cases to decrease, thus causing those refrigerated products to be adversely affected. Shelf life is the amount of time that a product will remain acceptable to a customer, given specified storage temperatures. To insure the effective use of its HVAC system in preserving refrigerated food products, petitioner's maintenance manual for its stores for the year at issue provided as follows: Heating, Ventilating, and Air-Conditioning Systems
1. Temperature Settings -- a. Leave the thermostat set at 72 degrees position all year, as any deviation may adversely affect the condition of perishable foods. [Emphasis supplied.] b. The heating or air-conditioning *616 systems will automatically turn on, depending upon which system is needed. c. If it is necessary to change the thermostat setting, contact the service technician. d. Prohibit employees from changing the thermostat setting. e. Governmental energy saving proclamations may from time to time alter this thermostat setting, and you will be notified in writing describing the adjustment necessary. Studies show that variances in the temperature at which a particular refrigerated food product is displayed can have a direct adverse effect on the quality of such product by shortening the product's shelf life. Further, it is generally accepted that increases in ambient store temperatures above case manufacturers' specifications cause temperature increases within open-front cases which are designed to keep the temperature of the food displayed therein at a specific temperature. Consequently, if the retail store's temperature is not constantly maintained within case specifications, then case temperatures cannot be constantly maintained and the food displayed therein will suffer a shortened shelf-life. As an example, the shelf life of meat products in any of petitioner's open-front meat *617 cases is directly influenced by the temperature of the air therein. Meat that is displayed at an internal case temperature of 32 degrees Fahrenheit has a shelf life that lasts many days longer than meat that is maintained at a temperature a few degrees higher. If the store environment is not controlled by a HVAC system, and if the temperature of the store increases above that specified by the case manufacturer, the temperature within the meat case will also rise and will no longer be optimal for extended shelf life of meat products which will spoil more quickly. Similarly, shelf life of frozen food products is decreased by an occurrence known as "freezer burn." "Freezer burn" is caused by fluctuations in ambient store temperature above case manufacturer's specifications which cause temperature fluctuations within open-front frozen food cases. As the temperature of frozen foods fluctuates, this causes many food products to dehydrate causing "freezer burn." Thus, the failure to use a HVAC system can easily result in lost product, sales, and profits. In order to maintain a strictly controlled ambient store environment that is below 75 degrees Fahrenheit and 55 percent relative humidity, *618 as recommended by the open-front case manufacturers, petitioner, like most food retailers, installed a HVAC system in each of its stores to reduce relative humidity and temperature fluctuations. However, during the summer months, the outdoor temperatures at the locations of petitioner's stores at issue would often reach or be in excess of 90 degrees Fahrenheit. The variance in petitioner's store temperature and the outdoor temperature created discomfort to many customers who complained to petitioner's employees that the stores were uncomfortably cold. Nevertheless, petitioner could not raise its store temperature to accommodate its customers without risking spoilage of its refrigerated food products displayed in open-front cases. In 1979, the Department of Energy (DOE) issued proposed energy conservation regulations which prohibited business establishments from heating their premises above 65 degrees Fahrenheit or cooling their premises below 80 degrees Fahrenheit. These regulations created an exemption for retail food stores. The prefacatory discussion accompanying the proposed DOE regulations, 44 Fed. Reg. 31,927-31-928 (1979), explains: In formulating the *619 provisions relating to general exemptions for classes of uses within covered buildings, DOE has sought to carry out the Plan's objectives of achieving significant and immediate reduction in energy demand while avoiding severe economic loss or serious hazards to health. Thus, the exemptions in the proposed regulations focus on these areas; no exemptions based solely on personal comfort are included. [Emphasis supplied.] * * * * * * Proposed section 490-31(a)(3) is intended to avoid health hazards where certain temperature and humidity levels are required for the proper storage and handling of food and other agricultural commodities. By way of illustration, this section would exempt supermarkets and grocery stores where temperature and humidity levels other than those mandated in the regulations are required to preserve produce or for the proper refrigeration of perishable items on open shelf units. Respondent submitted expert witness reports prepared by Robert Reynolds, a private consultant in marketing economics, and Richard Calvert, a mechanical engineer who participated in the design of HVAC systems for 12 stores between 1959 and 1969. Mr. Reynold's report quotes *620 from a 1963 book, Modern Supermarket Operation, which made the following observations about the importance of air conditioning in a retail food store: A few years ago, air conditioning was considered a luxury. Since that time, supermarket operators have come to the conclusion that they pay for air-conditioning whether they use it or not. Loss of sales volume and increased spoilage of perishable foods during the hot months are direct business losses resulting from lack of air conditioning; often these losses exceed the cost of an air conditioning unit. Consequently, air conditioning is now standard equipment in supermarkets. [Emphasis supplied in report.] F. Brand, Modern Supermarket Operation (2d ed. 1963). Petitioner did not claim investment tax credits on its HVAC systems placed in service for the year at issue on its Federal corporate income tax return for such year. Rather, petitioner raised the issue of its entitlement to such credits subsequently, during an examination by respondent. The amount of investment tax credits to be allowed petitioner, should the Court determine that petitioner is entitled to such credits for the HVAC systems, has been stipulated by *621 the parties. The parties have also stipulated that petitioner will be entitled to additional cost recovery deductions for the HVAC systems under section 168 if petitioner prevails on the investment tax credit issue. OPINION The issue for decision is whether the HVAC systems installed in petitioner's retail food stores qualify as section 38 property for investment tax credit purposes. Section 38 allows a credit against tax for investments in certain types of property, described as "section 38 property." Section 38 property includes, in relevant part, "Tangible personal property (other than an air-conditioning or heating unit)." The parties dispute whether petitioner's HVAC systems installed in its retail food stores are tangible personal property within the meaning of section 48(a)(1)(A) and the regulations promulgated under that section. Although section 48(a)(1)(A) explicitly makes reference to "an air-conditioning or heating unit," respondent has not argued that the HVAC systems at issue come within the parenthetical language of section 48(a)(1)(A). In Piggly Wiggly Southern, Inc. v. Commissioner,84 T.C. 739, 755 (1985), *622 affd. 803 F.2d 1572 (11th Cir. 1986), this Court held that the legislative intent behind the parenthetical language was that the investment tax credit would be denied only in the case of portable air conditioners and heaters. Respondent makes no contention that petitioner's HVAC systems are portable air conditioners and heaters. The regulations provide guidance as to the meaning of "tangible personal property" within the meaning of section 48(a)(1)(A). Section 1.48-1(c), Income Tax Regs., provides in pertinent part: For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property. Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. *623 [Emphasis supplied.] Accordingly, petitioner's HVAC systems are tangible personal property qualifying for the investment tax credit if they are not "structural components." The term "structural components" is defined in section 1.48-1(e)(2), Income Tax Regs., as follows: The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as panelling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; * * * and other components relating to the operation or maintenance of a building. However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery *624 or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. For example, an air conditioning and humidification system installed in a textile plant in order to maintain the temperature or humidity within a narrow optimum range which is critical in processing particular types of yarn or cloth is not included within the term " structural components." * * * [Emphasis added.] Section 1.48-1(e)(2), Income Tax Regs., represents an accurate interpretation of congressional intent with respect to HVAC systems and has the full force and effect of law. Piggly Wiggly Southern, Inc., v. Commissioner, supra;Fort Walton Square, Inc., v. Commissioner,54 T.C. 653 (1970). The parties agree that the HVAC systems are " structural components" not eligible for the investment tax credit unless the HVAC *625 systems qualify under the "sole justification" test of section 1.48-1(e)(2), Income Tax Regs.
This Court has recently decided a case, Piggly Wiggly Southern, Inc. v. Commissioner, supra, which respondent acknowledges is very similar, factually, to the instant case. Piggly Wiggly Southern, Inc. v. Commissioner, supra, involved an investment tax credit issue arising out of HVAC systems utilized in retail food stores owned by Piggly Wiggly Southern, Inc. In that case, we made a factual determination that "the sole justification for the installation of the HVAC units in [the taxpayer's] stores was that the HVAC units were essential to meet the temperature or humidity requirements for the operation of [the taxpayer's] refrigeration equipment, and the benefit to [the taxpayer's] workers and customers was incidental," at 753. Respondent argues that the record presented by petitioner is factually distinguishable from the record presented in Piggly Wiggly Southern, Inc. v. Commissioner, supra. We disagree. Respondent's only contention is that petitioner's HVAC systems do not meet the "sole justification" *626 test. Petitioner contends that its sole justification for installing the HVAC systems in its stores was to meet the temperature and relative humidity requirements of its open-front refrigerated food cases and its computerized checkout systems. While respondent agrees that petitioner's retail food stores require HVAC systems to keep ambient store temperature within case manufacturers' specifications and prevent spoilage, respondent contends that a substantial reason for installing HVAC systems was to provide customer and employee comfort. Respondent relies on its two experts and their submitted reports in support of this contention. We do not find respondent's experts persuasive in support of this proposition because many of the authorities relied upon by respondent's experts do not directly support the expert's conclusion that the sole justification for installing HVAC systems was not that the HVAC systems were essential to meet the specifications for petitioner's open-front cases. In support of its contention with respect to the open-front cases, respondent asserts that retail food stores, to remain competitive, require an ambient store environment that is comfortable to *627 its customers and employees. Respondent further asserts that the manufacturers designed their refrigerated cases so that such cases could operate in an environment that is comfortable to customers. Respondent contends that manufacturers could have designed the cases to operate properly optimally at lower "uncomfortable" store temperatures. However, respondent asserts that since the retail food industry had established a comfortable environment for its customers and employees as a standard, cases were designed to fit that standard. Therefore, respondent concludes that the justification for the installation of the HVAC systems was also to provide a comfortable environment to customers and employees and not solely for the operation of its cases. First, we find fault with respondent's premise that the cases always operated at a "comfortable" ambient store temperature. During periods of the year outdoor temperatures substantially exceeded the strictly maintained store temperature; it caused the store temperature to be uncomfortably cold to many of its customers. Second, if the case manufacturers' justification for its specifications was to permit petitioner to maintain comfortable store *628 temperatures and relative humidity levels, petitioner was still required to install HVAC systems in order to control the interaction between the ambient store environment and the internal case environment by not exceeding case manufacturers' specifications. If specifications were exceeded, petitioner's refrigerated food inventory would spoil. This strict 24 hour control of store environment was even recognized by the DOE as a factor in issuing an exemption for retail food stores from its energy conservation measures. The fact that manufacturers may have designed their cases so they could generally be operated in a "comfortable" ambient environment was an incidental benefit to petitioner. As the Court in Piggly Wiggly Southern, Inc. v. Commissioner, supra at 753 observed: It is bootstrapping to argue, post hoc ergo propter hoc, that where a collateral benefit necessarily follows an action, that the collateral benefit belies another basis as the justification for the action. * * * Petitioner was involved in a competitive industry and was extremely sensitive to the fact *629 that if it did not maintain case manufacturers' specifications for store environment, whatever those specifications may be, the quality of its food products displayed in its open-front cases would suffer, resulting in lost product, sales, and profits. It was for this reason that it was crucial to the operation of each of petitioner's retail food stores that each had a HVAC system. Given that case manufacturer specifications permitted petitioner to both maintain its stores at a temperature and relative humidity suitable for proper case performance and a degree of customer comfort, the fact that petitioner chose an environment for its stores that attempted to achieve both only makes sense. Any additional incidental benefit to customers and employees does not belie petitioner's sole justification for installing the HVAC systems -- i.e., to maintain its cases and thus preserve the quality of its food products. Based on a review of the evidence, we conclude that the sole justification for the installation of the HVAC systems was to maintain the specifications recommended for the proper operation of petitioner's open-front cases. We hold that petitioner's HVAC systems meet *630 the exception to the term "structural components" contained in section 1.48-1(e)(2), Income Tax Regs. Accordingly, petitioner's HVAC systems at issue are tangible personal property under section 48(a)(1)(A) and qualify as section 38 property for investment tax credit purposes. [5]
To reflect the foregoing, and footnote 2, supra, An appropriate order has been issued.
Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended, and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. By Order, dated this date, the Court, on its own motion, has severed the remaining issues in the case for purposes of opinion and additional briefing on these issues.↩
3. The computerized checkout systems consist of several components which include an electronic cash register, a scale, a display, and a scanner device. ↩
4. Petitioner's open-front cases were manufactured by a variety of corporations and were of the following types: (1) meat; (2) frozen food; (3) deli; (4) produce; (5) service meat and fish; (6) service deli; (7) an ice cream dipping cabinet; and (8) dairy.↩
5. We need not address petitioner's argument that the HVAC systems were also installed to meet the temperature and humidity requirements of its computerized checkout systems. Failure to prove this would not establish that the HVAC systems were installed for customer and employee comfort.↩