PUBLIX SUPERMARKETS,
INC., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 35–89T.

United States Claims Court.

April 28, 1992.

Carl F. Bauersfeld, Bethesda, Md., attorney of record, for plaintiff.

Benjamin C. King, Jr., Tax Div., Dept. of Justice, Washington, D.C., with whom was Shirley D. Peterson, Asst. Atty. Gen., attorneys of record, for defendant.

OPINION

HORN, Judge.

BACKGROUND

The plaintiff, Publix Supermarkets, Inc., is a Florida corporation engaged in the business of owning and operating retail

food and drug stores.[1] Publix Supermarkets are self-service retail markets which sell basic grocery products, including general merchandise, health and beauty aids, and non-perishable and perishable food items. During the 1981 tax year, the plaintiff operated 251 supermarkets in the State of Florida and had sales totaling approximately $2.37 billion. In 1982, the plaintiff's business expanded to include 262 Florida supermarkets, with total sales of approximately $2.5 billion.

The plaintiff corporation[2] filed timely federal corporate income tax returns with the Internal Revenue Service (IRS) for the fiscal years 1981 and 1982. The corporation reported tax liability of $23,189,292.00 and $28,888,425.00, respectively, which the plaintiff paid to the United States in installments in 1981 and 1982.

During the 1981 and 1982 tax years,[3] the plaintiff purchased, installed, and placed in service, in new and remodeled stores, heating, ventilating and air-conditioning (HVAC) systems. The plaintiff also purchased replacement components and incurred service and labor costs to install replacement parts for HVAC systems previously installed. Total expenditures on these HVAC systems was $645,619.00 in 1981 and $900,356.00 in 1982. The plaintiff did not claim an investment tax credit for these expenditures on its federal corporate income tax returns.

On November 25, 1987, the plaintiff filed amended tax returns with the IRS seeking a refund of federal income taxes for the 1981 and 1982 tax years in the amount of $68,633.00 and $103,306.00, respectively, with interest. The plaintiff asserted it was entitled to these refunds as a result of

expenses incurred during the 1981 and 1982 tax years for the installation and maintenance of HVAC systems, which, the plaintiff alleged, were investments entitling them to tax credits under sections 38 and 48 of the Internal Revenue Code of 1954.

On November 21, 1988, the IRS sent to the plaintiff notices disallowing the claims for refund for the 1981 and 1982 tax years in the respective amounts of $59,520.00 and $78,299.00. The portions of the refund claims allowed by the IRS for the 1982 tax year related to investment tax credits claimed on property other than the HVAC systems in the plaintiff's supermarkets. All of the investment tax credits claimed by plaintiff for HVAC related expenses for the 1981 and 1982 tax years, however, were disallowed because the IRS determined that the HVAC systems installed in the Publix Supermarkets did not qualify as "section 38 property," as defined in section 48(a)(1) of the Internal Revenue Code and Treasury Regulations, section 1.48–1, promulgated, pursuant to the Code, by the United States Department of Treasury.

The plaintiff filed this action in the United States Claims Court to recover from the IRS an alleged overpayment of federal income taxes for the years 1981 and 1982.[4] The plaintiff stated in a post-trial filing made with the court:

"It is plaintiff's position that during the [tax] years involved, it purchased and installed HVAC equipment or systems that were essential for the *proper* operation of its refrigerated food display cases and the processing of foodstuffs. Thus, Plaintiff contends that the 'sole justifica-

1. "Food World" was a trade name also used by Publix Supermarkets, Inc. for some of its stores in 1981 and 1982. Food World is not a separate corporation.

2. The plaintiff uses the accrual method of accounting and a financial and taxable year of 52/53 weeks, ending on the last Saturday in December.

3. "Tax years" refers to the plaintiff's fiscal years ending December 26, 1981, and December 25, 1982.

4. In a second count in its Complaint, the plaintiff sought to recover for certain wages paid to employees who, the plaintiff asserted, were eligible employees under section 50B(h)(1) of the Internal Revenue Code, I.R.C. § 50B(h)(1)(1988), entitling the plaintiff to claim Work Incentive Credit (WIN). On December 27, 1990, the parties filed a Stipulation of Partial Dismissal with this court, stipulating that the claims for the WIN credits be dismissed, thus obviating the need for the court to address the second count of the plaintiff's Complaint.

tion test' of the foregoing regulation [1.48–1(e)(2) ] is met." (Emphasis added).

The defendant, however, asserts that the plaintiff cannot meet the requirements of the "sole justification" exception to the "structural components" limitation of the Treasury Regulations, section 1.48–1(e)(2). The defendant argues that under the "sole justification" exception, the plaintiff must first establish that the McQuay HVAC systems installed in the Publix Supermarkets were required to meet temperature or humidity requirements which were essential for the operation of other machinery or the processing of materials or foodstuffs. The defendant argues, that based on the facts presented at trial, the plaintiff has failed to establish entitlement to the investment tax credit. Furthermore, the defendant contends that even if the plaintiff's McQuay HVAC systems were essential to the operation of the plaintiff's other machinery or the processing of materials or foodstuffs, if installation of those systems also provided for the comfort of the plaintiff's customers and employees, the "sole justification" exception will not apply, unless providing for comfort and health was "incidental to" the principal need. The defendant, however, argues that the plaintiff also cannot satisfy the "incidental to" requirement of the "sole justification" exception.

This case comes before the court for decision following a three-day trial. The central issue presented is whether the plaintiff is entitled to the investment tax credit provided in section 38 of the Internal Revenue Code of 1954 in connection with costs incurred for the purchase and maintenance of central airconditioning and heating equipment (HVAC systems) in the tax years 1981 and 1982. For the reasons set forth below, judgment is entered for the defendant.

### FACTS

According to testimony adduced at trial from Mark Irby, Vice President of Marketing & Advertising for Publix, retail grocery stores typically operate on a slim margin of profits,[5] and high volume sales are re-quired to maintain a successful supermarket chain. Moreover, while sales of health and beauty aids, general merchandise, and non-perishable food items are important to sustaining the overall sales volume of a supermarket, the availability of perishable food items is widely recognized as the real customer draw, which generates a large percentage of the total store volume. People cannot easily store perishable foods for prolonged periods of time and they must shop for them more frequently than non-perishable products. By stocking perishable food items, retail markets are able to provide the abundant and extensive variety of food products which consumers have come to expect. Therefore, to remain competitive and maintain the high volume sales necessary to stay in business, supermarkets must stock perishable food items. In fact, Mr. Irby estimated that a very large percentage of the total volume of sales resulted from the sales of refrigerated or perishable food products.

In accordance with customary practice in the retail supermarket business, the plaintiff sells health and beauty aids, general merchandise, and non-perishable goods off shelves arranged in aisles in each Publix Supermarket. Perishable food products, generally classified as those food products requiring refrigeration, are presented for sale in refrigerated display cases. Because sales of frozen and refrigerated foods account for a significant portion of total store volume in the plaintiff's retail business, a comprehensive marketing strategy revolving around refrigerated display cases is followed in each of the plaintiff's supermarkets. Basically, the plaintiff's marketing strategy involves stocking perishable food items in refrigerated display cases placed around the perimeter of each supermarket. Given the propensity of customers to shop for perishable food items more frequently than for other products carried in a supermarket, this strategy is thought to increase each customer's exposure to products that do not require refrigeration, thereby, increasing the supermarket's total sales volume.

---

**5.** According to Mr. Irby, the plaintiff's profit percentages were 1.69 in 1981 and 1.87 in 1982.

According to Janice Ferguson, the Director of Corporate Quality Assurance for Publix, whose responsibilities include food safety issues and food quality issues, health regulations in Florida delineate the standards supermarkets located within that State must follow with regard to the sale of perishable food items. Those regulations require that eggs, meat, poultry, seafood, and dairy products be stocked at or below 45 degrees fahrenheit (F) or above 140 degrees F. Frozen foods must be kept at 0 degrees F. Refrigerated display cases are specially designed to meet these requirements and are utilized by every retail supermarket. By holding a particular product inside an insulated well and enveloping it with a circulation of cold air that has passed through an evaporator, refrigerated display cases keep the desired temperature and humidity level within the case. This method of storage allows supermarkets to stock perishable food items, increases the shelf-life [6] of displayed products, and helps prevent the dehydration of food, or "freezer burn," caused by fluctuations in the temperature of the surrounding environment.

During the 1981 and 1982 tax years, the plaintiff installed or maintained a variety of refrigerated display cases, manufactured by the C.V. Hill Refrigeration Company (Hill), in each Publix Supermarket. While the plaintiff does use closed refrigerated display cases for some products, the majority of refrigerated and frozen food products carried by Publix Supermarkets are stocked in open-front cases.[7] For high volume products, open cases are considered to be more efficient than cases enclosed with a glass door because open cases are designed with an air screen which keeps the cold air trapped inside the well of the case, no matter how often customers reach into the case for a product. The closed cases do not have this air screening; therefore, each time a customer opens the door

to the case, the cold air spills out of the case, forcing the freezer to work harder to bring the temperature down again. Moreover, although no formal studies have been conducted, the use of open-front cases is considered to be more conducive to sales because the barrier between the customer and the product is eliminated, thus improving product accessibility.

The Hill refrigerated display cases installed in the plaintiff's supermarkets are designed to operate properly in stores where temperature and relative humidity are maintained according to certain specifications. The specifications for the Hill cases used in Publix Supermarkets during the tax years at issue recommended an ambient store environment at or below 75 degrees F and at or below 55 percent relative humidity.

In order to maintain the ambient store environment recommended by Hill, the plaintiff alleges it had to install McQuay HVAC systems in each Publix Supermarket to reduce relative humidity and temperature fluctuations within its supermarkets. The McQuay HVAC systems chosen by the plaintiff and installed in each Publix Supermarket consist of several different components. The cooling unit itself is an air handler installed on the roof of the supermarket which contains a condensing unit and compressor. This unit is regulated by an electric control and operates through the use of a series of cooling coils, subcooling coils, heat reclaim coils, electric heat coils and a blower. The cooling unit is connected to duct work which distributes air within the supermarket and draws the return air from the supermarket back into the cooling unit for reconditioning. The return air in the plaintiff's supermarkets consists of air drawn from underneath the refrigerated display cases and air drawn through ceiling diffusers located throughout each store.[8] There are two principal

---

6. "Shelf-life" is defined as the amount of time a product is acceptable to a customer.

7. The plaintiff's open-front cases were of the following types: (1) meat; (2) frozen foods; (3) deli; (4) produce; (5) service meat and fish; (6) service deli; and (7) dairy.

8. The plaintiff's expert testified that in the two, sample Publix Supermarkets studied in preparation for this trial, return air came 91 percent from underneath the refrigerated display cases and nine percent through the ceiling diffusers.

HVAC systems on the roof of each Publix Supermarket which condition the air in the sales area where the refrigerated display cases are located. The capacity of these two main systems is 22 tons each. The reconditioned air from these main systems is distributed as follows: 36 percent in the front of the supermarket, 43 percent on the perimeter of the supermarket, where the refrigerated display cases are located, and 21 percent in the remaining areas of the supermarket. There are separate HVAC systems in each supermarket servicing the meat preparation room and the computer room.[9] The capacity of the system servicing each supermarket's meat preparation room is 10 tons. The systems servicing the computer rooms in each supermarket range from two to three tons. All four HVAC systems operate 24 hours a day, 365 days a year.

## DISCUSSION

In order to evaluate the claim made by the plaintiff, the court must examine Part IV—*Credits Against Tax*, included in the Internal Revenue Code. Section 38 of the Internal Revenue Code of 1954 (Code), I.R.C. § 38 (1988), which was in effect during the tax years at issue in the instant case, 1981 and 1982, allowed a credit against taxes owed for investments in certain types of property commonly designated as "section 38 property":[10]

> § 38. Investment in certain depreciable property
>
> (a) General rule
>
> There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part.
>
> (b) Regulations
>
> The Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B.

I.R.C. § 38. Subpart B, section 48(a) of the Code, specifically defines "section 38 property" as follows:

> (1) **In general—**
>
> Except as provided in this subsection, the term 'section 38 property' means—
>
> (A) tangible personal property (other than an air conditioning or heating unit),[11] * * *

I.R.C. § 48(a)(1)(A) (1988).[12]

This skeletal definition is given flesh in the Treasury Regulations, Treas.Reg. § 1.48–1 (1990), formulated pursuant to the

---

9. In its Complaint, the plaintiff states that it installed HVAC systems "to meet temperature and humidity requirements essential for the operation of the refrigerated food cases, and computerized check-out systems in Plaintiff's stores." However, having mentioned the computerized check-out systems in the Complaint, the plaintiff does not support this claim at all during the presentation of its case at trial.

10. The investment tax credit, with limited exceptions, was repealed by the Tax Reform Act of 1986, Pub.L. No. 99–514, § 211, 100 Stat. 2085, 2166, effective for property placed in service after December 31, 1985.

11. Section 48(a)(1)(A) was amended by the Energy Tax Act of 1978, Pub.L. No. 95–618, § 301(d)(1), 92 Stat. 3174, 3199, to include the parenthetical phrase "(other than an air conditioning or heating unit)." The addition of this language is intended to exclude only portable air conditioning and heating units from the definition of tangible personal property. *Piggly Wiggly Southern, Inc. v. Comm'r*, 84 T.C. 739, 749–50 (1985), *aff'd*, 803 F.2d 1572 (11th Cir. 1986). The defendant here has not argued that the McQuay HVAC systems at issue come within the parenthetical language of section 48(a)(1)(A).

12. Although the plaintiff never develops and supports the argument that the food preparation activities carried on in its supermarkets placed it in the business of manufacturing or production for purposes of section 48(a)(1)(B)(i), in several of its filings with this court, the plaintiff makes passing reference to food processing activities carried on in the Publix Supermarkets.

Section 48(a)(1)(B)(i) states that the term "section 38 property" includes "other tangible property (not including a building or its structural components) but only if such property is used as an integral part of manufacturing, production, or extraction...." Activities involving the sale of merchandise and food to the general public for personal or household consumption and the rendering of services incidental to the sale of such goods, however, are considered retail activities, rather than manufacturing or production activities. *See* Rev.Rul. 81–66, 1981–1 C.B. 19, 20 (1981). The food prepared in the Publix Supermarkets was for direct sale to, and consumption by, the general public. Thus, any preparation of food carried on in the plaintiff's supermarkets was incidental to the retailing ac-

express, congressional authorization and direction in section 38(b) of the Internal Revenue Code to promulgate such regulations.

According to Treasury Regulations, section 1.48–1(c), the definition of tangible personal property does not include a building or its "structural components." Treas. Reg. § 1.48–1(c). The Regulation provides, in pertinent part:

> * * * For purposes of this section, the term 'tangible personal property' means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). * * * Tangible personal property includes all property (*other than structural components*) which is contained in or attached to a building. * * *

Treas.Reg. § 1.48–1(c) (emphasis added). Thus, the plaintiff's McQuay HVAC systems can be considered tangible personal property, which can qualify for the investment tax credit, if this court determines they are not "structural components" of the Publix Supermarkets.

"Structural components" are further defined in the Regulation as including central heating and air-conditioning systems and related duct-work. Treas.Reg. § 1.48–1(e)(2). Specifically, the Regulation states:

> The term 'structural components' includes such parts of a building as walls, partitions, floors, and ceiling, as well as any permanent coverings therefor such as panelling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air-conditioning or heating system, including motors, compressors, pipes and ducts, ... and other components relating to the operation or maintenance of a building. * * *

Treas.Reg. § 1.48–1(e)(2).

A narrow exception to the general definition of "structural components" applies, however, when equipment is installed with the "sole justification" of meeting certain limited temperature and humidity requirements essential for the operation of other machinery or the processing of materials or foodstuffs. Treasury Regulation section 1.48–1(e)(2) continues:

> * * * However, the term 'structural components' does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the 'sole justification' test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. For example, an air conditioning and humidification system installed in a textile plant in order to maintain the temperature or humidity within a narrow optimum range which is critical in processing particular types of yarn or cloth is not included within the term 'structural components.' * * *

Treas.Reg. § 1.48–1(e)(2).[13]

The application of the exception to the general rule, commonly referred to as the "sole justification" exception, is the central issue of the present dispute. In order to resolve this case the court must decide: Whether the "sole justification" for the installation of the McQuay HVAC systems in plaintiff's food stores, in tax years 1981 and 1982, was to meet the temperature and relative humidity requirements of the Hill refrigerated food cases in plaintiff's food stores.

■ In a tax refund case, there is a strong presumption of the correctness of

---

tivities and was not among the activities encompassed by section 48(a)(1)(B)(i).

**13.** *Piggly Wiggly Southern, Inc. v. Comm'r*, 84 T.C. 739, 750 (1985), *aff'd*, 803 F.2d 1572, 1574 (11th Cir.1986), and *Ft. Walton Square, Inc. v. Comm'r*, 54 T.C. 653 (1970), confirmed that the

Treasury Regulations, section 1.48–1(e)(2), represent an accurate interpretation of the congressional, statutory intent regarding the treatment of heating and air conditioning equipment as part of an investment tax credit, and that the Regulations have full force and effect of law.

the findings of the Commissioner of Internal Revenue, and the taxpayer has the burden of rebutting that presumption and of establishing entitlement to a specific amount of a deduction claimed. *United States v. Janis*, 428 U.S. 433, 440–41, 96 S.Ct. 3021, 3025–26, 49 L.Ed.2d 1046 (1976); *Helvering v. Taylor*, 293 U.S. 507, 514, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935); *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Danville Plywood Corp. v. United States*, 899 F.2d 3, 7–8 (Fed.Cir.1990); *L.W. Hardy Co. v. United States*, 1 Cl.Ct. 465, 470 (1982); *Young & Rubicam, Inc. v. United States*, 187 Ct.Cl. 635, 654–55, 410 F.2d 1233, 1244–45 (1969). In order to overcome this presumption, the taxpayer has the burden of presenting "substantial evidence as to the wrongfulness of the Commissioner's determination." *KFOX, Inc. v. United States*, 206 Ct.Cl. 143, 151–52, 510 F.2d 1365, 1369 (1975) (citing *Comm'r v. Riss*, 374 F.2d 161 (8th Cir.1967)). The burden imposed on a plaintiff is both the burden of going forward and the burden of persuasion. A plaintiff first must come forward with enough evidence to support a finding contrary to the Commissioner's determination. *Danville Plywood Corp.*, 899 F.2d at 7–8; *Transamerica Corp. v. United States*, 902 F.2d 1540, 1543 (Fed.Cir.1990). But, even after satisfying the burden of going forward, a plaintiff must still carry the ultimate burden of proof. *Id.*

■ The plaintiff here argues that the "sole justification" exception is met if installation of the McQuay HVAC systems can be justified on the basis of the fact that such systems are required to meet temperature and humidity standards which are essential to the proper functioning of equipment, or the carrying on of heat of humidity sensitive processes.[14] Therefore, the plaintiff contends that its McQuay HVAC systems, when they were installed, fall within the regulatory "sole justification" exception to the "structural components" limitation and qualify for an investment tax credit because those systems were essential to the proper operation of its Hill refrigerated display cases. Furthermore, the plaintiff asserts that any other benefit provided by the McQuay HVAC

---

**14.** The following language, which includes no claim that the "processing of foodstuffs" language should apply to plaintiff's case, appears in plaintiff's Complaint:

> During the taxable years 1981 and 1982, Plaintiff expended additional amounts of $686,326 and $1,033,064 for tangible personal property to remodel grocery stores and for heating, ventilating, and air conditioning ("HVAC") systems installed in certain stores to meet temperature and humidity requirements essential for operation of the refrigerated food cases, and computerized check-out systems in Plaintiff's stores.

Only in the plaintiff's post-trial filing, styled "Plaintiff's Brief After Receipt of Transcript," does the plaintiff state: "It is Plaintiff's position that during the years involved, it purchased and installed HVAC equipment or systems that were essential for the proper operation of its refrigerated food display cases and the processing of foodstuffs."

At trial, only Ms. Janice Ferguson, the Director of Corporate Quality Assurance for the plaintiff, offered very limited testimony regarding the food processing activities performed in Publix Supermarkets. In her trial testimony, Ms. Ferguson discussed health regulations in the State of Florida, and briefly outlined the steps taken at Publix Supermarkets to comply with those regulations. After testifying that the produce preparation rooms at Publix Supermarkets were air-conditioned to 75 degrees, Ms. Ferguson explained the reason for maintaining an air-conditioned environment as follows:

> Well, we take a lot of pains with the products that we sell in our stores, to keep produce in a refrigerated warehouse and ship it on a refrigerated truck and hold it in a cooler at the store level, to have any time frame where you're not refrigerating or keeping that product cold, you're basically defeating everything that you've done previously to the sale.
> We want to be able to offer our customers the highest quality food that they can buy.

The plaintiff did not further develop an argument that the McQuay HVAC systems were essential for the processing of foodstuffs in its Publix Supermarkets. The plaintiff failed to introduce further probative evidence or elicit specific testimony regarding the need for McQuay HVAC systems for its food processing activities.

By solely relying on the general testimony of Ms. Ferguson, the plaintiff failed to demonstrate that the McQuay HVAC systems were essential to the food preparation activities conducted in Publix Supermarkets, if, in fact, it was even their intention to pursue this particular claim. Consequently, this court believes that the plaintiff cannot qualify for an investment tax credit based on an exception created by activities related to food processing.

system was incidental to the principal need for their installation, which was to maintain temperature standards essential to the proper functioning of the "other machinery," in this case the Hill refrigerated display cases.

The defendant, on the other hand, argues that the "sole justification" test is a rigid, two-part test, both prongs of which must be satisfied by the plaintiff to bring the McQuay HVAC systems installed in the Publix Supermarkets within the exception to the definition of "structural components," thus qualifying that equipment for the investment tax credit. Under the defendant's two-part test, the plaintiff must first establish that the McQuay HVAC systems were essential for the operation of the Hill refrigerated display cases or the preparation of foodstuffs. Second, the defendant asserts that even if the plaintiff's McQuay HVAC systems were essential to the operation of the Hill refrigerated display cases or the preparation of foodstuffs, if the installation of those systems also provided for the comfort of the plaintiff's customers and employees, the "sole justification" exception will not apply, unless providing for comfort and health was incidental to the principal need.

The defendant asserts that the "sole justification" test demands a case specific analysis of the characteristics of the particular specific system for which the investment tax credit is being claimed and of the functions that particular system performs. Using the defendant's interpretation of the "sole justification" test, the question is not whether, as a general matter, the plaintiff needed air-conditioning for the proper operation of the refrigerated display cases. Rather, according to the defendant, the inquiry in the instant lawsuit should be whether the specific equipment for which the investment tax credit is claimed was essential to the operation of the refrigerated display cases, and also whether the choice of that equipment only incidentally provided for the comfort and health of the plaintiff's customers and employees.

The defendant suggests that the plaintiff cannot meet the requirements of this "sole justification" test for two reasons. First, the defendant argues that the Hill refrigerated display cases installed in the plaintiff's supermarkets would operate without the McQuay HVAC systems. Second, even if this court determines that the McQuay HVAC systems are required for the operation of the Hill refrigerated display cases, the defendant claims that the particular HVAC systems installed were not chosen for that purpose. It appears from the evidence adduced at the trial that the McQuay HVAC systems chosen by the plaintiff to service the Publix Supermarkets were designed to, and did in fact, perform four functions. The McQuay HVAC systems were designed to provide heat, ventilation, air distribution, and cooling and dehumidification. According to the defendant, cooling and dehumidification are directly related to the operation of the refrigerated display cases. The other functions, the defendant argues, are designed to provide for the comfort and health of the plaintiff's customers and employees. Under the defendant's reading of the "sole justification" test, when an HVAC system is designed and intended to provide for comfort and health, those considerations are not incidental, even though that HVAC system might also be designed to provide for the operation of refrigerated display cases.

The "sole justification" exception relied on by the plaintiff provides that "the term 'structural components' does not include machinery the *sole* justification for the installation of which is the fact that such machinery is *required* to meet temperature or humidity requirements which are *essential* for the operation of other machinery or the processing of materials or foodstuffs." Treas.Reg. § 1.48–1(e)(2) (emphasis added). The language of the Treasury Regulation, especially the words "sole," "required" and "essential," is precise and presumably was chosen deliberately by its promulgators. Consequently, a literal reading of the language in section 1.48–1(e)(2) does not support the plaintiff's argument that the McQuay HVAC systems fall within the "sole justification" exception because the systems are required for the *proper* or efficient operation of its Hill refrigerated

display cases. Under the Regulation, the question is not whether the refrigerated display cases would operate more efficiently or more economically with an HVAC system; rather, the question is whether the McQuay HVAC system was "essential" to meet temperature or humidity requirements so that the Hill refrigerated display cases would operate. *See Circle K Corp. v. Comm'r,* 51 Tax Ct.Mem.Dec. (P–H) para. 82,298, at 1265 (1982). Moreover, even if this court determines that the McQuay HVAC systems were required for the operation of the plaintiff's Hill refrigerated display cases, if installation of those systems also provided for the comfort and health of the plaintiff's customers and employees, the court concludes that the "sole justification" exception will not apply, unless providing comfort and health was a benefit incidental to the operation of those refrigerated display cases. *Id.* at 1265.

The plaintiff primarily relies on United States Tax Court decisions in *Piggly–Wiggly Southern,* 84 T.C. at 739, *aff'd* 803 F.2d 1572, and in *Albertson's, Inc. v. Comm'r,* 57 Tax Ct.Mem. (P–H) para. 88,582 (1988), to support its claim that the McQuay HVAC systems at issue should qualify for the investment tax credit. The facts in *Piggly–Wiggly* and *Albertson's* are, essentially, the same. Both cases involved supermarket chains which claimed that their HVAC systems were installed with the sole justification of providing the proper ambient temperature and humidity for the operation of refrigerated display cases. In each case, the IRS argued before the Tax Court, and in *Piggly–Wiggly* also before the United States Court of Appeals for the Eleventh Circuit, that the supermarkets were air-conditioned to provide a comfortable environment for customers and employees. The Tax Court reviewed the taxpayers' evidence concerning why they had installed the HVAC systems and made factual determinations that the "sole justification" for the installation of the systems was to meet the temperature and humidity requirements of their refrigerated display cases, and that any benefit to customers and employees was incidental to the principal need. The plaintiff here asserts that

the facts in the present case are indistinguishable from the facts in *Piggly–Wiggly* and *Albertson's.* This court disagrees.

In *Piggly–Wiggly* and *Albertson's,* the Tax Court found as a matter of fact that the particular HVAC systems were designed specifically to meet the requirements of the refrigerated display cases, and that the taxpayers selected the particular HVAC systems solely for that purpose. The courts' fact finding in each case was specific to that case and based primarily on the testimony and credibility of the parties' expert witnesses. Moreover, in both cases, the court concluded that the government's expert witnesses were not credible and that their testimony was entitled to little or no deference.

In *Piggly–Wiggly,* 84 T.C. at 752–53, the government argued that the HVAC systems were installed to enable the plaintiff to compete with other air-conditioned supermarkets in attracting customers. The Tax Court determined that the government's expert witness, Mr. Dennis Nonaka, a valuation engineer for the IRS who rendered technical advice on depreciation, investment credit, and allocation of purchase price issues, had no experience in refrigeration or the food store industry. In preparing his report, Mr. Nonaka had relied on generalized information regarding supermarket refrigeration equipment and HVAC systems gleaned from a speech given on the topic by a refrigeration company official dealing in general terms with the entire retail supermarket industry. Therefore, the court decided that Mr. Nonaka's report, which concluded that the HVAC units were installed for customer and employee comfort, had failed to look at facts relating to Piggly–Wiggly's specific situation. *Id.*

By contrast, the Tax Court found the testimony of Mr. Benny Smith, Piggly–Wiggly's manager of refrigeration and energy systems at the time the HVAC systems were installed, to be grounded on specific facts and persuasive. *Piggly–Wiggly,* 84 T.C. at 744. The HVAC systems placed in Piggly–Wiggly's supermarkets were designed by Mr. Smith, a witness the

court found to be "forthright, knowledgeable, and credible." *Id.* Mr. Smith testified that his choice of systems and designs was based upon the needs of the refrigeration equipment in Piggly–Wiggly's supermarkets, and not upon considerations of customer comfort. *Id.* According to the court, "[o]ne reason the HVAC units were selected was because they are designed to meet, automatically, the 55–percent relative humidity requirements of the refrigerator cases." *Id.*

Likewise, in *Albertson's,* 57 Tax Ct.Mem. Dec. (P–H) para. 88,582, at 3016–17, where the plaintiff asserted its HVAC systems were installed solely to meet the temperature and humidity requirements of its refrigerated food cases and its computerized check-out system, the government contended that a substantial reason for installing the HVAC systems was to provide for customer and employee comfort. The Tax Court found that the government's experts did not present persuasive expert evidence to support its position that a substantial reason for installing the HVAC systems was to provide customer and employee comfort. The court concluded that the facts relied on by the government's experts did not directly support the contention that the HVAC systems were installed by Albertson's for reasons other than meeting environmental standards essential to the operation of open-front refrigerated cases. *Id.*

Because the section 1.48–1(e)(2) "sole justification" exception applies to machinery installed solely "to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs," a factual determination as to why the plaintiff made particular expenditures for which tax credits are claimed is necessary to determine whether the "sole justification" test is met. *Piggly–Wiggly Southern, Inc. v. Comm'r,* 84 T.C. 739 (1985), *aff'd,* 803 F.2d 1572, 1576 (11th Cir.1986) (*Piggly–Wiggly* ); *see also Morrison, Inc. v. Comm'r,* 55 Tax Ct.Mem.Dec. (P–H) para. 86,129, at 558 (1986), *aff'd,* 891 F.2d 857 (11th Cir.1990). Each case must rest on the merits of the facts presented. In other words, each case must be decided by the factfinder as a question of fact.

The case at bar presents a factually different situation from that encountered by the Tax Court in either *Piggly–Wiggly* or *Albertson's.* In the instant case, both the plaintiff and the government presented expert testimony offered by professionals experienced in the field of supermarket refrigeration and environmental control. However, as is discussed more fully below, after listening to the testimony during the trial, having had an opportunity to view each of the witnesses as they testified, and after reviewing the transcript of the testimony presented, this court finds the specific, well reasoned testimony of the government's expert, Dr. Charles Dorgan, to be more persuasive and, in this case, determinative.

The "sole justification" exception requires that a plaintiff first establish that the particular HVAC systems installed were required for the operation of its refrigerated display cases. Treas.Reg. § 1.48–1(e)(2). The plaintiff primarily relies on the testimony of its expert, Mr. Paul Adams, to establish the necessity of installing the McQuay HVAC systems to maintain temperature or humidity requirements which were essential for the operation of the Hill refrigerated display cases within the Publix Supermarkets.

The plaintiff's expert witness, Mr. Paul Adams, has over thirty years of practical experience in the manufacture and design of refrigerated display cases. For nineteen of those years, Mr. Adams worked with Hussman Refrigeration Company, the largest manufacturer of commercial refrigeration systems in the United States, where, during his tenure, he served as Director of Advanced Engineering, Product Manager for Refrigeration Products and Manager of the Hussman Laboratory. For the last fifteen years, Mr. Adams has been in business for himself as a consulting engineer in the area of commercial refrigeration. In his consulting business, Mr. Adams has participated in the design of HVAC systems for several large supermar-

ket chains in the mid-west, but did not participate in the design of the HVAC systems installed in the plaintiff's stores.

Mr. Adams testified that the McQuay HVAC systems installed in the plaintiff's supermarkets were required for the operation of the Hill refrigerated display cases. However, Mr. Adams never referred to any specific measurements or calculations to support his conclusions. On cross-examination Mr. Adams admitted he had not made any measurements on the amount of air infiltration coming into either of the two Publix test stores. And, although he said he had done some load calculations, he could not testify as to the results of those calculations. From the testimony offered by Mr. Adams, it appeared that a number of his conclusory statements that the McQuay HVAC systems were required for the operation of the Hill refrigerated display cases were primarily based on his prior experience in the supermarket-refrigeration field. This court acknowledges that Mr. Adams has extensive practical experience in the area of supermarket refrigeration and environmental control. At times, however, his testimony was contradictory and argumentative. But, even more significantly, he failed to specifically direct the court to measurements or calculations to support his conclusion that the McQuay HVAC systems were required for the operation of the Hill refrigerated display cases. Without specific documentary evidence or specific testimony, this court must find that the plaintiff has failed to support its claim for the investment tax credit and for a tax refund.

The government's expert, Dr. Charles Dorgan, who holds a PhD in mechanical engineering, also presented excellent credentials to this court. In addition to teaching courses in air-conditioning, refrigeration, and energy design at the University of Wisconsin, Dr. Dorgan has participated in an ongoing six year study for the electric utility industry to model air-conditioning within supermarkets to create more

energy efficient systems. One aspect of these studies involves the interaction between supermarket HVAC systems and refrigerated display cases. Dr. Dorgan also testified to his practical experience in the design of supermarket HVAC systems as a consulting engineer.

Dr. Dorgan testified before this court, based on calculations he made in preparation for the trial, that the McQuay HVAC systems installed in the Publix Supermarkets were not required for the operation of the plaintiff's Hill refrigerated display cases. Furthermore, Dr. Dorgan stated that comfort is a prime consideration in the selection of an HVAC system and, in his opinion, Publix installed the McQuay HVAC systems with the primary concern being the comfort and health of customers and employees.

Based on calculations made at two Publix Supermarkets [15] and an examination of the technical specifications of the McQuay HVAC systems, Dr. Dorgan concluded that the Hill refrigerated display cases provided sufficient cooling to offset the heat produced in the supermarket. Furthermore, Dr. Dorgan determined that the Hill refrigerated display cases would maintain the supermarket environment at less than 75 degrees F without the installation of additional air-conditioning equipment. Dr. Dorgan made measurements at the test supermarkets and calculated the total cooling provided by the Hill refrigerated display cases. Dr. Dorgan found that the cooling produced by the Hill refrigerated display cases was greater than the cooling required in each supermarket, and he determined that the refrigerated display cases could keep the supermarket cool without any air-conditioning.

The American Society of Heating, Refrigeration and Air–Conditioning Engineers (ASHRAE), in chapter two of its Handbook, also indicates that refrigerated display cases can have this effect in a supermarket.[16] In discussing the design and

**15.** The parties selected two test stores and agree that the two stores studied in preparation for this trial represent the standard designs used in each of the plaintiff's supermarkets.

**16.** In direct testimony before this court, Mr. Adams, the plaintiff's expert, stated that the ASHRAE Handbook represents "the key design guide for heating and air-conditioning and ven-

application of air-conditioning and heating systems for supermarkets, the ASHRAE Handbook says:

the open refrigerator thus acts as a large air cooler, absorbing heat from the room and rejecting it via the condensers to outside the building. Occasionally, this conditioning effect can be more than the design air-conditioning capacity required by the store.

To further support his conclusion that the McQuay HVAC system was not essential to the operation of the Hill refrigerated display cases, Dr. Dorgan concluded that if the HVAC systems in the plaintiff's stores shut down, the temperatures in front of the refrigerated display cases would not go up, rather, the temperature immediately in front of the cases would drop to about 50 degrees F while the average temperature throughout the supermarket would remain 75 degrees F. Again, this conclusion is consistent with information in the ASHRAE Handbook. Chapter 47 of the Handbook, under the sub-heading "Intereffect Between Refrigeration and Air–Conditioning," states that large amounts of heat are extracted from the supermarket sales area by open refrigerated display cases. The Handbook goes on to state, "[c]alculations will show that this total amount of heat is often enough to reduce the store indoor temperature as much as, and often sometimes more than, 9 degrees C [48 degrees F] below outdoor ambient." Therefore, the ASHRAE Handbook says, "in mild climates heat must be added to the store to maintain comfort conditions even when, theoretically, there is no heating requirement and the cooling cycle should be in effect."

Unlike the government's experts in *Piggly–Wiggly* and *Albertson's*, this court found the government's witness, Dr. Dorgan, to be a credible witness with the practical experience and educational background to support his well reasoned, well documented and specific conclusions. The

plaintiff's expert, Mr. Adams, however, was found by the court to be a far less persuasive and vague witness. Mr. Adams' testimony on direct examination was contradicted by his prior deposition testimony on several points, and even by the exhibits introduced on behalf of the plaintiff. Moreover, Mr. Adams' failure to provide measurements or calculations to support his conclusion that the McQuay HVAC systems were required for the operation of the Hill refrigerated display cases led this court to find his testimony unpersuasive.

Not only does the testimony of the plaintiff's expert, Mr. Adams, fail to support the plaintiff's claim that its McQuay HVAC systems should be excepted from the definition of "structural components" based on the "sole justification" exception. The plaintiff's position is further undermined by the testimony of the other witnesses at trial and the documentary evidence introduced into the trial record. As is discussed below, the cumulative effect of all of the trial testimony and evidence admitted into the record establishes that a substantial purpose for the installation of the McQuay HVAC systems was to provide for the comfort and health of the plaintiff's customers and employees, a purpose that is outside the scope of the regulatory exception in the Treasury Regulations, section 1.48–1(e)(2). Although, here again, some of the considerations may be similar in the case at bar to the issues presented by *Piggly–Wiggly* and *Albertson's*, the facts presented at the Publix trial are clearly distinguishable from the facts present in the two earlier decided cases.

At the trial, the plaintiff referred to Department of Energy (DOE) regulations enacted in 1979 in further support of its argument that the McQuay HVAC systems were required to maintain temperatures essential for the operation of its Hill refrigeration equipment. In May 1979, the DOE

---

tilating equipment." This direct testimony was in accord with his deposition testimony during which, Mr. Adams said that the ASHRAE Handbook was the "standard source" in the air conditioning or refrigerating business for the design of supermarket HVAC systems. On cross-exam-

ination, however, when confronted with the fact that the ASHRAE Handbook contradicted much of his testimony, Mr. Adams stated that the Handbook was incomplete, incorrect, and did not apply to the plaintiff's supermarkets.

reported that continuing reduced levels of world crude oil production had resulted in a severe national energy supply shortage which was having a major, adverse impact on the national economy. Therefore, pursuant to sections 201(a) and (b) of the Energy Policy and Conservation Act, Pub.L. No. 94–163, 89 Stat. 821 (1975), the President, through the DOE, developed Emergency Building Temperature Restrictions. 10 C.F.R. 490; 44 Fed.Reg. 39,354 (1979). The final regulations prescribed specific heating and cooling restrictions of 65 degrees F and 78 degrees F for both simple and complex HVAC systems. The objective of these restrictions was the achievement of a significant and immediate reduction in energy demand.

In its post-trial brief, the plaintiff quotes from comments to the proposed regulations which appeared in the Federal Register as part of the DOE rule making procedure. Specifically, the plaintiff quotes from comments to the proposed general exemptions subpart of the regulation, 10 C.F.R. § 490.-31. Comments to proposed section 490.-31(a)(3) state:

> Proposed § 490.31(a)(3) is intended to avoid health hazards where certain temperature and humidity levels are required for the proper storage and handling of food and other agricultural commodities. By way of illustration, this section would exempt supermarkets and grocery stores where temperature and humidity levels other than those mandated in the regulations are required to preserve produce or for the proper refrigeration of perishable items in open shelf units.

44 Fed.Reg. 31,922, 31,927–28 (1979).

The significance of this section of the regulation, the plaintiff argues, is that the DOE recognized that a strict 24–hour control of the supermarket environment was necessary in order to preserve produce or for the proper refrigeration of perishable items in open-front refrigerated display cases. Therefore, the plaintiff relies on this section in its effort to show that the McQuay HVAC systems were required for the operation of its Hill refrigerated display cases.

This court does not agree that the DOE regulations are relevant to its inquiry into whether the McQuay HVAC systems were required for the operation of the plaintiff's Hill refrigerated display equipment. The comments to the final rule quite clearly state that "[s]ection 490.31(a)(3) does not provide a general exemption for the retail food and restaurant industries." 44 Fed. Reg. 39,354, 39,359–60. In fact, the plaintiff was not required to raise its thermostats because, due to the complex nature of the McQuay HVAC systems used in the Publix Supermarkets, more energy would be used in raising the thermostat to 78 degrees F than allowing it to remain at 75 degrees F.

The final DOE regulations excluded buildings in which it was demonstrated that compliance with the requirements of the regulations would result in the consumption of more energy than operation at some other temperature level. As Dr. Dorgan testified, a reheat HVAC system, such as those in the plaintiff's supermarkets, first cools the air to a very low temperature and then reheats it to a comfortable temperature. To raise the thermostat on a reheat HVAC system from 75 degrees F to 78 degrees F would require more heat to be used, thus consuming more energy. This is why buildings containing reheat HVAC systems were eligible for exemptions from the Emergency Building Temperature Restrictions. 10 C.F.R. § 490.18; 44 Fed.Reg. 39,354, 39,359. The comments to the DOE regulations do not sway this court's judgment that the McQuay HVAC systems installed in the plaintiff's supermarkets were not required for the operation of the Hill refrigerated display equipment.

The section 1.48–1(e)(2) "sole justification" exception excludes from the term "structural components," machinery, "the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs." Machinery may, however, qualify for the section 1.48–1(e)(2) "sole justification" excep-

tion "even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential." Therefore, even if the court were to determine that the McQuay HVAC systems were required for the operation of the plaintiff's refrigerated display cases, the court still would need to address the plaintiff's intent behind the installation of the McQuay HVAC systems.

The plaintiff maintains that it installed the McQuay HVAC systems solely to maintain the proper environment for refrigerated display equipment in the Publix Supermarkets, and that, like the situations presented in the *Piggly–Wiggly* and *Albertson's* cases, any other benefit provided by the HVAC systems was incidental to the need to maintain the supermarket environment for the operation of the refrigerated display cases. The defendant claims, however, that the plaintiff installed McQuay HVAC systems to provide for the comfort and health of customers and employees.

The plaintiff argues that the section 1.48–1(e)(2) "sole justification" exception should not be so narrowly construed as to mean that the word "only" could be substituted for the word "sole." The plaintiff refers to an example provided by the Treasury Regulations, section 1.48(e)(2), to emphasize its point:

> For example, an air conditioning and humidification system installed in a textile plant in order to maintain the temperature or humidity within a narrow optimum range which is critical in processing particular types of yarn or cloth is not included within the term 'structural components.' * * *

Treas.Reg. § 1.48(e)(2). In addition, the plaintiff cites to the opinion issued by the Eleventh Circuit Court of Appeals in affirming the Tax Court in *Piggly–Wiggly*. *Piggly–Wiggly*, 803 F.2d 1572 (11th Cir. 1986). In that opinion, the Eleventh Circuit declined to give the "sole justification" exception a "construction that renders it applicable only to heating, air conditioning, and humidification equipment that cannot reasonably be adapted to maintain an environment suitable for human habitation." *Piggly–Wiggly*, 803 F.2d at 1575.

Certainly, the "sole justification" exception should not be so narrowly interpreted as to require that the exclusive justification for the installation of the McQuay HVAC systems was to meet refrigerated display equipment requirements and that an HVAC system once installed should never produce comfort as a by-product. Nevertheless, the language of the section 1.48–1(e)(2) "sole justification" exception and the example given in that section make it clear that in order for machinery to be excepted from the term "structural components," it must be installed for the sole purpose of maintaining other equipment and that any other benefit must be "incidental" to that principal need. The Treasury Regulations, section 1.48–1(e)(2), clearly state that only machinery installed with the *sole justification* being the fact that such machinery is *required* for the operation of other machinery will be excepted from the term "structural components." The section does provide, however, that "machinery may meet the 'sole justification' test … even though it *incidentally* provides for the comfort of employees, …." Treas.Reg. § 1.48–1(e)(2) (emphasis added). Furthermore, the example provides that "an air conditioning and humidification system installed … in order to maintain the temperature or humidity within a *narrow* optimum range which is *critical* in processing … is not included within the term "structural components." Treas.Reg. § 1.48–1(e)(2) (emphasis added).

Even the case law relied on by the plaintiff stresses the restrictive nature of the Regulation. In affirming the Tax Court in *Piggly–Wiggly*, the Eleventh Circuit said that when HVAC systems are "installed *solely* to meet temperature or humidity requirements essential to the operation of other equipment, the HVAC machinery will not constitute structural components of the building irrespective of some incidental employee benefits." *Piggly–Wiggly*, 803 F.2d at 1575 (emphasis added). The court also specifically noted that the Tax Court had found "as a matter of fact that Piggly Wiggly chose this particular HVAC system in order to meet equipment specifications

and that customer and worker comfort was an incidental benefit." *Id.*

A trial court's inquiry into this level of the "sole justification" test might be described as the principal motivation test. This test is not unlike the Ninth Circuit Court of Appeals' application of the "permanency" test in *Consolidated Freightways, Inc. v. Comm'r*, 708 F.2d 1385 (9th Cir.1983). One issue in *Consolidated Freightways* was whether the lighting fixtures and overhead doors in truck loading docks were structural components, and, therefore, ineligible for the investment tax credit. To determine when an item functioning as a structural component should be excepted from the Regulation because it was not reasonably permanent, the Ninth Circuit looked at a variety of factors, including the function and design of the component at issue, the intent of the taxpayer in installing the component, and the effect of removal of the component on the building. *Id.* at 1390 (see text and also n. 7 on p. 1390).

Testimony and evidence admitted at trial, including the performance brochure and specifications for McQuay HVAC Systems, established that McQuay HVAC systems were designed to perform four functions. The first function was to provide heat to keep the supermarkets from becoming uncomfortably cold. Second, the HVAC system provided fresh air ventilation to meet health requirements. Third, the HVAC system provided even air distribution to maintain a constant temperature throughout the supermarket. Finally, the system provided cooling and dehumidification to condition the outside air being brought into the supermarket to meet ventilation requirements. Consequently, this court believes that a substantial reason for the installation of the McQuay HVAC systems in the Publix Supermarkets was to provide for the comfort and health of the plaintiff's customers and employees, a purpose that is outside the scope of the regulatory exception in the Treasury Regulations, section 1.48–1(e)(2).

The plaintiff's refrigeration supervisor, Mr. Robert Jirel, testified that the McQuay HVAC systems used in Publix Supermarkets provide three stages of heat, and that the entire system is electronically controlled to "keep it from getting too cold in the store." According to Mr. Jirel, providing heat was a function of customer comfort. Mark Irby, the plaintiff's marketing manager, testified that if Publix Supermarkets were too cold customers would shop elsewhere. He also stressed that the plaintiff was concerned about customer complaints that the supermarkets were too cold. Dr. Dorgan testified that the heat function of the McQuay HVAC system was solely for comfort. Furthermore, Dr. Dorgan concluded the refrigerated display cases would operate much more efficiently in colder store environments.

Mr. Adams, the plaintiff's expert, testified that the Hill refrigerated display cases could not operate at temperatures below 65 degrees F because warm air in the supermarkets was needed to defrost the cases. This testimony, however, is directly contrary to Mr. Adams' prior deposition testimony during which he stated that customer comfort was the only reason for not letting the temperature in the supermarket get too low. In his deposition testimony, Mr. Adams was asked why one would not keep the supermarkets at 55 degrees F or 60 degrees F, if the cases would operate more efficiently at those temperatures. In his response, Mr. Adams said that there was a "lower limit below which human beings will not tolerate." Mr. Adams deposition testimony did not mention anything about the operation of the refrigerated display cases or the need for warm air to defrost the cooling coils of the cases. Moreover, the technical specifications of the Hill refrigerated display cases make it clear that there would be no need to keep the supermarket air warm to defrost the cases because the Hill refrigerated display cases in the plaintiff's supermarkets use hot gas from the condensers in the case to defrost the cooling coils, not warm air from the store.

Mr. Adams' contention that there is a lower limit beyond which the refrigerated display cases cannot operate is further contradicted by the testimony of Mr. Jirel, the plaintiff's refrigeration supervisor. Mr.

Jirel testified that he knew of no minimum operating temperature below which the Hill refrigerated display cases would not operate. Dr. Dorgan also knew of no such minimum limit. The Hill product literature submitted into evidence by the parties also fails to support Mr. Adams' contention. The Hill literature clearly states that the supermarket conditions should not be above 75 degrees F. There is no mention anywhere of a minimum temperature and, if such existed, certainly Hill would have included it in the operating guidelines in which the maximum temperature was outlined.[17]

Although he tried to allude to another industry trade association as support, Mr. Adams acknowledged that there was nothing in the ASHRAE Handbook about heat being required for the operation of the refrigerated display cases. In fact, the ASHRAE Handbook makes it clear that comfort is the primary concern of the designer of a supermarket HVAC system with regard to heat. The ASHRAE Handbook states:

> To provide proper comfort and performance conditions, the design of heating and air-conditioning systems must compensate for three effects caused by open refrigerated display equipment. These are:
> 1. The increased heating requirements due to removal of large quantities of heat, even in summer.
> 2. The net air-conditioning load resulting after the deduction of the latent and sensible refrigeration effect, where the load reduction and change in sensible-latent load ratio have a major effect on the air-conditioning coil-compressor balance.
> 3. The need for special consideration of air circulation and distribution to offset the localized removal of large quantities of heat by open equipment.

Because heat is removed from where the refrigerated display cases are located, concentrations of multi-shelf open refrigerated fixtures can cause cold zones and cold aisles. A primary concern of the designer of a supermarket HVAC system appears to be the "cold aisle" problem.[18] The air cooled by the refrigerated display cases, being more dense, settles to the floor and becomes increasingly colder. "If this cold air is left dormant, it will cause discomfort and serve no purpose even though other areas of the store may need more cooling at the same time." Therefore, according to the ASHRAE Handbook, "the effect of heat extraction by display refrigerators must be considered in design of the air distribution system for a supermarket."

The second function of the HVAC system is to provide fresh air ventilation in the supermarket. Building codes in the State of Florida require that a certain amount of fresh air be brought into a building by the HVAC system to meet the health requirements of the people in the building. Mr. Adams agreed with Dr. Dorgan that health is not an incidental concern in connection with the ventilation function of the HVAC system. There was some testimony that ventilation was needed to pressurize the supermarkets to limit the amount of air coming in when the doors opened. Dr. Dorgan, however, suggested that the plain-

17. Mr. Adams acknowledged that the exhibits introduced by the parties with regard to the Hill refrigerated display cases did not support his testimony; nevertheless, he asserted that other Hill literature, not in evidence, did support his conclusions. Mr. Jirel, however, testified that he knew of no literature from Hill which contained a minimum operating standard for supermarkets using Hill refrigerated display cases.

18. The McQuay sales brochure emphasizes the importance of comfort considerations when it explains the "cold aisle problem." The McQuay brochure states:

A supermarket is very simply a vehicle for moving food products to the ultimate consumer. In exchange for this service, a supermarket operates on a profit margin normally of 1 percent or less. Successful operators realize the most important aspect of there business is the customer. Their patronage is highly valued and sought after. The appearance of the store, its products and the comfort of the customer are extremely important. Cold air spilling into the aisles from refrigerated cases and short circuiting of air over the merchandise area, caused by lack of positive air circulation and control result in low merchandise turnover and consequential lost profit.

tiff did not use ventilation for that purpose.[19]

Furthermore, Dr. Dorgan testified that the plaintiff's McQuay HVAC systems were designed to draw the cold air from in front of the refrigerated display cases and return it to the roof-top conditioning unit where the reconditioned air is then distributed throughout the supermarket. The ASHRAE Handbook makes it clear that the reason for this design specification is to keep the aisles where the refrigerated cases are located from being too cold. This was also the conclusion reached by Hussman, Mr. Adams former employer, as to the way to meet the complaints of supermarket owners that their stores were 50 degrees in the middle of the summer without the air-conditioners ever turning on.[20]

Certainly, under the applicable Treasury Regulation, machinery may qualify for the section 1.48–1(e)(2) "sole justification" exception "even though it incidentally provides for the comfort of employees, or serves to an insubstantial degree, areas where such temperatures or humidity requirements are not essential." After carefully considering the evidence submitted into the record and the testimony of the witnesses at trial, however, the court has determined that considerations of customer and employee comfort and health in the instant case were not incidental to the plaintiff's motivations for installing the McQuay HVAC equipment. Moreover, as stated above, this court does not agree with the plaintiffs repeated assertions that it "conclusively proved" that the McQuay HVAC systems were required for the operation of the Hill refrigerated display cases. Plaintiff's expert, Mr. Adams, did not present any measurements or calculations to support his conclusion, or to even challenge the testimony of the government's expert, Dr. Dorgan. Dr. Dorgan presented

persuasive evidence to suggest that the need for supermarket environmental control arose out of the need to prevent the stores from getting too cold as a result of heat extraction caused by refrigerated display cases. The exhibits presented at trial did not contradict Dr. Dorgan's testimony, rather, the exhibits supported his conclusions.

## CONCLUSION

For the reasons discussed more fully above, this court finds that based on the facts and the expert testimony presented at trial, and applying the relevant case law, the plaintiff has failed to prove that the McQuay HVAC systems are eligible for an investment tax credit under the Treasury Regulations, section 1.48–1. Consequently, the plaintiff's request for a tax refund is DENIED. Judgment is entered for the defendant.

IT IS SO ORDERED.

---

19. The total amount of air brought in by the plaintiff's HVAC systems for ventilation was 2600 cubic feet per minute (CFM). Of this, 2300 cfm was used to replace air exhausted from the supermarket, leaving only 300 cfm to be used for pressurization.

20. The ASHRAE Handbook also elaborates on this problem:

In recent years store owners and operators have frequently complained about cold aisles in stores, heating systems which operate even when the outdoor temperature is 78 F, and air conditioning systems which operate only infrequently. The blame for such complaints is usually attributed to spillover of cold air from open refrigerated display equipment.