**ALBERTSON'S, INC., Petitioner–Appellant–Cross–Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee–Cross–Appellant.**

Nos. 91–70380, 91–70381.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 4, 1993.

Submission Vacated March 11, 1993.

Resubmitted April 21, 1993.

Decided Dec. 30, 1993.

Robert S. Erickson, Hawley Troxell Ennis & Hawley, Boise, ID, for petitioner-appellant-cross-appellee.

Steven I. Frahm, Tax Div., U.S. Dept. of Justice, Washington, DC, for respondent-appellee-cross-appellant.

W. Mark Smith, Sutherland, Asbill & Brennan, Washington, DC, for amicus.

Before: CANBY, and REINHARDT, Circuit Judges, and TASHIMA, District Judge.[*]

## OPINION

REINHARDT, Circuit Judge:

### I. OVERVIEW

Petitioner Albertson's, Inc. ("Albertson's")[1] appeals two decisions of the United States Tax Court. In the first decision, the Tax Court held that Albertson's was not entitled to claim work incentive tax credits ("WIN credits") retroactively for its past hiring of certain welfare recipients. *See Albertson's, Inc. v. Commissioner*, 59 T.C.M. (CCH) 186, 1990 WL 29271 (1990). In the second decision, the Tax Court held that Albertson's was not entitled to claim current deductions for interest-like obligations that had accrued under deferred compensation agreements ("DCAs") made with certain of its top executives and directors. *See Albertson's, Inc. v. Commissioner*, 95 T.C. 415, 1990 WL 149185 (1990).

Respondent Commissioner of Internal Revenue ("Commissioner") cross-appeals a third decision of the United States Tax Court. In the third decision, the Tax Court held that Albertson's was entitled to claim investment tax credits for its heating, venti-

lating, and air-conditioning ("HVAC") systems. *See Albertson's, Inc. v. Commissioner*, 56 T.C.M. (CCH) 928, 1988 WL 137121 (1988).

We affirm the Tax Court with respect to its judgment on the first issue (WIN credits). We reverse the Tax Court with respect to its judgment on the second issue (DCAs). We also reverse the Tax Court with respect to its judgment on the third issue (HVAC credits). We discuss each issue separately below.

### II. DISCUSSION

#### A. Work Incentive Credits

*1. Background.* In 1971, Congress established work incentive ("WIN") tax credits to provide employers with an incentive to hire employees who might otherwise receive public assistance. Participating employers were required to submit certifications from state agencies showing that their employees were either receiving welfare assistance or participating in a work-incentive program at the time they were hired.[2] In return, the employer would receive a tax credit equal to a portion of the employee's first- and second-year wages.

Prior to January 29, 1982, Albertson's had hired numerous employees who qualified for the WIN credits. Some of these employees remained unidentified, however, and Albertson's was unable to claim any credits for them. In 1985, during an IRS audit of its 1983 return, Albertson's hired a consulting

---

[*] The Honorable A. Wallace Tashima, United States District Judge for the Central District of California, sitting by designation.

[1] Petitioner, a Delaware corporation, has its principal place of business in Boise, Idaho. Petitioner operates over 400 retail food and drug stores in the western, southern, and southeastern United States. Petitioner is an accrual basis taxpayer.

[2] Prior to 1981, the relevant provisions were as follows:

(1) *Eligible employee.*—For purposes of this subpart the term "eligible employee" means an individual—

(A) who has been certified by ... the appropriate agency of State or local government as—

(i) being eligible for financial assistance under part A of title IV of the Social Security Act and as having continually received such financial assis-

tance during the 90–day period which immediately precedes the date on which such individual is hired by the employer, or

(ii) having been placed in employment under a work incentive program established under section 432(b)(1) of the Social Security Act,

(B) who has been employed by the taxpayer for a period in excess of 30 consecutive days on a substantially full-time basis (except as provided in subsection (i)),

(C) who has not displaced any other individual from employment by the taxpayer, and

(D) who is not a migrant worker.

The provisions did not specify *when* certifications could be requested from the appropriate agencies, however. *See generally* I.R.C. § 50B(h)(1) (1980).

firm to help identify those employees. Albertson's discovered that 121 of its existing employees ("WIN employees") were qualified for the WIN credit program at the time of their hiring. It therefore requested and obtained state-agency. certification for those employees during the summer of 1985. ·

The IRS initially allowed Albertson's to certify its WIN employees retroactively. That is, Albertson's was permitted to submit certifications that it had requested and obtained *after* its WIN employees had already started work. The IRS later changed its mind, however, and assessed Albertson's for a tax deficiency of $141,795. Albertson's refused to pay and appealed to the Tax Court. The Tax Court held for the Commissioner, reasoning that Congress had abolished the retroactive certification of WIN employees in 1981. We affirm the judgment of the Tax Court.

■ *2. Analysis.* Albertson's argues that the Tax Court erred in refusing to allow it to submit certifications that it had requested and obtained after its WIN employees had already started work. We disagree. In 1981, Congress expressly abolished the retroactive certification of WIN credits through the Economic Recovery Tax Act of 1981, Pub.L. 97–34, 95 Stat. 172 ("ERTA").[3] The statute provides that an employee cannot qualify for WIN-type credits after September 26, 1981, unless his employer requests or obtains state-agency certification *"on or before* the date on which such individual begins work." *See* I.R.C. § 51(d)(16) (emphasis added). Congress imposed this contemporaneous certification requirement because it felt that retroactive certification failed properly to motivate employers to hire WIN-qualified workers and resulted in substantial revenue losses. *See* Staff of the Joint Committee on Taxation, *General Explanation of the Economic Recovery Tax Act of 1981*, at 171 (Joint Committee Print 1981) [hereinafter *Joint Committee Explanation*].[4]

Albertson's argues that another part of ERTA, § 261(g)(1)(B), creates an exception to the contemporaneous certification rule for all employees who were hired as of January 1, 1982.[5] It bases its argument on a provision that directs all current WIN employees to be treated "as if such employees had been members of a targeted group for taxable years beginning before January 1, 1982." *Id.* Albertson's argues that because its WIN employees were hired during taxable years beginning before January 1, 1982, the company should be allowed to certify them retroactively for any taxable year beginning after December 31, 1981.

3. The relevant provisions are currently codified as follows:

(16) Special rules for certifications.—
(A) In general.—An individual shall not be treated as a member of a targeted group unless, *on or before the day on which such individual begins work for the employer,* the employer—
(i) has received a certification from a designated local agency that such individual is a member of a targeted group, or
(ii) has requested in writing such certification from the designated local agency.
*See* I.R.C. § 51(d)(16) (emphasis added).

4. The current requirements for WIN-type credits are codified as follows:

(9) Eligible work incentive employees.—The term "eligible work incentive employee" means an individual who has been certified by the designated local agency as—
(A) being eligible for financial assistance under part A of title IV of the Social Security Act and as having continually received such financial assistance during the 90–day period which immediately precedes the date on which such individual is hired by the employer, or

(B) having been placed in employment under a work incentive program established under section 432(B)(1) or 445 of the Social Security Act. *See* I.R.C. § 51(d)(9). Technically speaking, WIN-type credits are currently called "targeted jobs credits." In 1981, Congress merged the WIN credit program with the then-existing targeted jobs credit program. It did so in order to prevent confusion among employers. Prior to ERTA, the targeted jobs credit program applied only to groups such as vocational rehabilitation referrals, economically disadvantaged youth, etc. After ERTA, the WIN credit was made part of the targeted jobs credit program. The basic requirements for a WIN-type credit remained the same, however, despite the name change. ₒ

5. Section 261(g)(1)(B) provides as follows:

(B) Eligible Work Incentive Employees.... In the case of an eligible work incentive employee, subsections (a) and (b) of section 51 of such Code [establishing the newly expanded targeted jobs credit] shall be applied for taxable years beginning after December 31, 1981, as if such employees had been members of a targeted group for taxable years beginning before January 1, 1982.

We reject Albertson's reading of section 261(g)(1)(B). That section was enacted simply to ensure that employees who had been hired under the old WIN program would not be treated any differently under the new targeted jobs program. As we explained above, Congress merged the WIN credit with the targeted jobs credit through ERTA, but did not change the basic qualifications for obtaining WIN-type credits. *See* discussion *supra* note 4. Accordingly, Congress wanted to ensure that the former WIN employees were not read out of the statute simply because they were now targeted employees. Section 261(g)(1)(B) does not address in any way the issue of retroactive certification. That determination is left to section 261(g)(2), which clearly abolishes retroactive certification for all claims made after September 26, 1981.[6]

Albertson's argument is also refuted by the express language of the act, which unambiguously states that the contemporaneous certification requirement "shall apply to *all individuals* whether such individuals began work for their employer *before, on, or after the date of enactment.*" *Id.* § 261(g)(2)(A) (emphasis added). In light of this language, Congress could not have possibly intended a broad-based exception to the contemporaneous certification rule for all employees who had been hired as of January 1, 1982.[7]

■ In sum, because Albertson's did not claim the WIN credits until after September 26, 1981 (in fact, not until 1985), and because it did not request or obtain state-agency certification until after the start dates of the 121 employees in question, it cannot rely upon retroactive certification for its WIN employees. Accordingly, it is not entitled to the WIN credits.[8]

### B. Deferred Compensation Agreements

1. *Background.* Deferred compensation agreements ("DCAs") are agreements in which certain employees and independent contractors ("DCA participants") agree to wait a specified period of time ("deferral period") before receiving bonuses, salaries, or director's fees for services already rendered ("deferred compensation"). During the deferral period, the employer uses the deferred compensation as an inexpensive source of working capital. At the end of the deferral period, the employer pays the participating individuals the deferred compensation *and* an additional amount ("additional

6. The relevant provisions are as follows:
   (2) Certifications.—
   (A) In general.—The amendment made by subsection (c)(1) shall apply to all individuals whether such individuals began work for their employer before, on, or after the date of the enactment of the Act.
   (B) Special rule for individuals who began work for the employer before 45th day before date of enactment.—In the case of any individual ... who began work for the employer before the date·45 days before the date of the enactment of this Act, [current I.R.C. § 51(d)(16)] shall be applied by substituting "July 23, 1981," for the day on which such individual begins work for the employer.
   (C) Individuals who begin work for employer within 45 days before or after date of enactment.—In the case of any individual ... who begins work for the employer during the 90–day period beginning with the date 45 days before the date of the enactment of this Act ... [current I.R.C. § 51(d)(16)] shall be applied by substituting "the last day of the 90–day period beginning with the date 45 days before the date of the enactment of this Act" for the day on which the individual begins work for the employer.
   *See* ERTA § 261(g)(2). In effect, the transitional rules allowed retroactive certification for certain requests made on or before September 26, 1981 (which was 45 days after the enactment of ERTA). All requests made after that date—as was the case with Albertson's—were subject to the general rule on contemporaneous certification.

7. At least one other circuit has held that ERTA abolished the ability of employers to certify their WIN employees retroactively. *See Honeywell, Inc. v. United States*, 973 F.2d 638 (8th Cir.1992).

8. Albertson's also argues that the Commissioner is bound by a stipulation that precluded any discussion of the effect of ERTA on retroactive certifications. C.R. 21, at ¶ 65. However, it is well established that we are not bound by stipulations as to questions of law. *See Smith Engineering Co. v. Rice*, 102 F.2d 492, 499 (9th Cir. 1938), *cert. denied*, 307 U.S. 637, 59 S.Ct. 1034, 83 L.Ed. 1519 (1939) ("We see no reason why we should make what we think would be an erroneous decision, because the applicable law was not insisted upon by one of the parties."). Because the effect of ERTA on retroactive certifications is clearly a question of law, we reject Albertson's argument.

amount") for the time value of the deferred compensation.

Prior to 1982, Albertson's entered into DCAs with eight of its top executives and one outside director. The parties agreed that they would be paid deferred compensation plus an additional amount as calculated by a predetermined formula.[9] The DCA participants would be eligible to receive the total sum (the deferred compensation plus the additional amount) upon their retirement or termination of employment with Albertson's. The DCA participants also had the option of deferring payment of the total sum for up to fifteen years thereafter. During that extra period, the additional amounts would continue to accrue on an annual basis.

In 1982, Albertson's requested permission from the IRS to deduct currently the additional amounts (but not the deferred compensation), instead of waiting until the end of the deferral period.[10] In 1983, the IRS granted Albertson's request. Accordingly, Albertson's claimed deductions of $667,142 for the additional amounts that had already accrued, even though it had not yet paid the DCA participants anything. In 1987, the IRS changed its mind, however, and sought a deficiency for those amounts. Albertson's filed a petition with the Tax Court, claiming that the additional amounts constituted "interest" and thus could be deducted as they accrued.

In a sharply divided opinion, the Tax Court rejected Albertson's position. The court found that the additional amounts were not interest, but rather compensation. Under section 404 of the Internal Revenue Code, compensation was not deductible until the end of the deferral period. Accordingly, the court prohibited Albertson's from deducting its expenses relating to the additional amounts until the end of the deferral period. *See Albertson's,* 95 T.C. at 430.[11] We reluctantly reverse the judgment of the Tax Court.

■ *2. Discussion.* This issue raises two related questions. First, we must decide whether the tax court erred in finding that the additional amounts were not "interest" within the meaning of the Code. Second, if so, we must decide whether section 404's restrictions against making deductions prior to the end of the deferral period (the "timing restrictions") applied to interest expenses. We answer the first question in the positive and the second in the negative.

■ *a. Albertson's Additional Payments.* Albertson's argues that the Tax Court erred in holding that the additional

---

**9.** The terms of the eight executives' agreements were as follows:

3.1 The COMPANY agrees to defer payment of certain compensation earned by EMPLOYEE during each fiscal year, such deferred compensation to be paid to EMPLOYEE after EMPLOYEE'S employment is terminated. The compensation to be . deferred shall be as set forth ... below:

. . . .

3.2 The COMPANY agrees to pay to EMPLOYEE a further sum of money equal to the amount of interest accrued which shall be calculated by applying a rate of interest to the total accumulated amount of deferred compensation including accrued interest compounded monthly. The rate to be used will be the weighted average of the COMPANY'S long term borrowing rate for that current fiscal year.

. . . .

The outside director was paid on his additional amount at a rate equivalent to the rates for new certificates of deposit over $1,000,000 as published in the Wall Street Journal.

**10.** In light of the time value of money, it is clearly more advantageous for the taxpayer to take an earlier deduction. Such a deduction reduces the taxpayer's current tax obligations and accordingly allows the taxpayer to invest the assets that he would have otherwise paid to the IRS.

**11.** The nine-member majority held that the additional amount was not currently deductible because it was not interest. The four-member concurrence argued that the additional amount was interest, but that section 404's timing restrictions applied to *both* compensation and interest. The five-member dissent argued that the additional amount was interest and that section 404's timing restrictions applied *only* to compensation. One judge did not participate.

Oddly, one member of the court voted both in favor of the majority *and* in favor of the concurrence. This resulted in nine votes in favor of calling the additional amounts "compensation," and nine votes in favor of calling the additional amounts "interest." Because both parties agree that the former position is the "majority" holding of the Tax Court, we accept their characterization throughout this section of the opinion.

amounts were not "interest" within the definition of I.R.C. § 163. We agree. Section 163(a) allowed a deduction for "all interest paid or accrued within the taxable year on indebtedness." Although neither section 163 nor the regulations relating to it specifically defined "interest," the Supreme Court has held that interest is the measure of the value of the use of money over time. *See Dickman v. Commissioner,* 465 U.S. 330, 337, 104 S.Ct. 1086, 1091, 79 L.Ed.2d 343 (1984). The additional amounts specified in the DCAs were a direct reflection of what Albertson's would have paid on the open market in order to borrow such amounts. *See* 2 B. Bittker & L. Lokken, *Federal Taxation of Income, Estate and Gifts,* ¶ 60.2.1 (2d ed.1990) (describing the interest component of DCAs, which "reflect[s] the time value of money"). Accordingly, they were a fair measure of the time value of the monies loaned to Albertson's by the DCA participants, and they qualified as interest under the Code.[12]

■ The Commissioner argues that the additional amounts were not interest because Albertson's never properly "borrowed" the deferred compensation from the DCA participants. According to the Commissioner, Albertson's could not have borrowed the deferred compensation because the DCA participants never had a "legal right to possess" such compensation until the end of the deferral period.[13] We disagree. As the Tax Court concurrence points out, this approach is "anachronistic." *Albertson's,* 95 T.C. at 431 (Halpern, J., concurring).[14] Circuit precedent clearly holds that a legal right to possession of the assets on which the additional amounts are earned is not necessary in order for those earnings to qualify as interest. For example, in *Starker v. United*

*States,* 602 F.2d 1341 (9th Cir.1979), we recognized interest that accrued in exchange for the ability to make deferred payments over a five-year period. We recognized interest in *Starker* even though the interest payee had no legal right to possess the deferred payments in full until the end of the five-year period. The controlling principle was not possession, but rather "compensation for the use or forbearance of money." *Id.* at 1356. We find this case indistinguishable from *Starker.* Accordingly, the Commissioner's argument fails.

■ The Commissioner further argues that the additional amounts were not interest, but rather additional deferred compensation. We disagree. The predetermined rate for calculating the additional amounts did not depend in any way upon the amount or type of services performed by the participants. The rate was simply a function of the time that had elapsed since the signing of the DCAs. Under the DCA, participating employees performed the same services and received the same salary as their non-participating colleagues. The only difference between the two groups was the delay in payment and the additional amount received at the end of the deferral period. Accordingly, the additional amounts were not additional compensation, and the Commissioner's argument fails.

■ Upon a participant's termination of employment with Albertson's, he could still elect to defer payment of the additional amount for up to fifteen years, even though he was no longer providing services to the corporation. Again, the participants were not required to perform any services in return for compensation. The additional

12. Of course, a taxpayer's characterization of what is "interest" is subject to a rule of reason. Otherwise, most of a taxpayer's obligations under a DCA could be characterized as "interest." We conclude that the interest component in this case is not unreasonable.

13. This is because the DCA participants are on the cash method of accounting, which means that they do not include the additional amounts as income until it is paid to them at the end of the deferral period.

14. Indeed, in recent years Congress has aggressively attempted to identify many forms of "hid-

den" interest. *See, e.g.,* I.R.C. §§ 163(b), 467, 483, 1272, 7872. The Commissioner argues that those provisions can be distinguished in that they all seek to *prevent* tax avoidance. We reject this argument. The government cannot recognize interest when it results in more revenue, but deny it when it results in less. The Commissioner simply cannot have it both ways. Indeed, to deny an interest element in this transaction would be "to stand history on its head." *See Albertson's,* 95 T.C. at 433 n. 4 (Fay, J., dissenting).

amount was calculated at the same rate at which the interest had accrued prior to the employee's termination. Accordingly, the additional amounts were not compensation, and the Commissioner's argument fails.[15]

■ The Commissioner finally argues that the additional amounts were not interest because they were not payments for true "indebtedness" by Albertson's. *See* I.R.C. § 163(a) (allowing interest only on payments for "indebtedness"). We disagree. The Tax Court has held that indebtedness is an "unconditional legally enforceable obligation for the payment of money." *Horn v. Commissioner*, 90 T.C. 908, 923, 1988 WL 44098 (1988). In this case, the DCAs were bona fide, nonforfeitable contracts, and Albertson's was unconditionally and legally obligated to pay the DCA participants for deferring their compensation upon the rendering of their services.[16] Accordingly, the additional amounts were payment for indebtedness, and the Commissioner's argument fails.

■ *b. Section 404 and Interest Expenses.* Having held that the additional amounts are interest within the meaning of section 163, we now turn to the question whether the timing restrictions of section 404 applied to interest expenses—in other words, did section 404 prohibit Albertson's from deducting such expenses prior to the time the participants were required to recognize the additional amounts as income? Based on a plain-language reading of the statute in effect during the taxable year at issue, we conclude that the answer is no—the timing restrictions did *not* apply to interest expenses. Albertson's was therefore free to deduct such expenses as they accrued. Accordingly, we reverse the judgment of the Tax Court.

Prior to 1942, corporations were allowed to deduct DCA-related expenses as they accrued each year, even though employees did not recognize any income until a subsequent taxable year. In 1942, Congress abolished this preferential treatment for certain deductions relating to "unqualified" DCAs such as the ones at issue in this case.[17] In so doing, Congress forced employers to wait until the *end* of the deferral period before they could deduct expenses relating to their unqualified DCAs. *See* I.R.C. §§ 404(a)(5) & 404(d) (1983).[18] This is because section 404 of the Code prohibited an employer from deducting certain expenses until they were includible in

---

**15.** The Commissioner responds by arguing that the additional amounts were compensation because the DCA participants agreed to provide "advisory and consulting services" for as long as they chose to defer payment. This argument fails, however, because the participants were not required to perform any specific services and because the rate at which the additional amounts were calculated was identical to the pre-termination interest rate.

**16.** The Commissioner cites *Deputy v. du Pont*, 308 U.S. 488, 497, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940) for the proposition that "an obligation is not necessarily an 'indebtedness' within the meaning of § 23(b) [the predecessor of § 163]." *Du Pont* is not instructive, however, because it involved an obligation by the taxpayer to return certain shares of stock that it had borrowed from the lender. The obligation incurred in *du Pont* did not involve the time value of money.

**17.** Unqualified plans are those that, among other things, discriminate in favor of highly compensated employees. *See* I.R.C. § 401(a)(4). Albertson's concedes that the DCAs at issue in this case are not qualified plans.

**18.** The relevant provisions, at the time Albertson's filed its 1983 tax return, were as follows:

Sec. 404. Deduction for ... compensation under a deferred-payment plan.

(a) General rule.—.... [I]f compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such ... compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but if they satisfy the conditions of either of such sections, they shall be deductible ...

(5) .... in the taxable year in which an amount attributable to the contribution is includible in the gross income of employees participating in the plan....

(d) Deductibility of payments of deferred compensation, etc., to independent contractors.—If a plan would be described [as above].... [the] compensation—

(1) shall not be deductible by the payor thereof under section 162 or 212, but

(2) shall ... be deductible under this subsection for the taxable year in which an amount attributable to the ... compensation is includible in the gross income of the persons participating in the plan.
*Id.*

the income of the DCA participants, which was usually not until the end of the deferral period.[19]  *See id.*

In the taxable year at issue, the Code and regulations specified two categories of deductions to which the timing restrictions of section 404 applied.  First, section 404 applied to section 162 deductions, *see* I.R.C. § 162, which included "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."  *See* I.R.C. § 404(a)(5) (1983).  Second, section 404 applied to section 212 deductions, *see* I.R.C. § 212, which included "all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income."  *See id.; see generally* Treas.Reg. § 1.404(a)–1(b) (1983).[20]

The interest accrued under the DCAs in this case did not fall within either of the above categories.  Interest deductions, which included "all interest paid or accrued within the taxable year on indebtedness," were covered by section 163 of the Code.  *See* I.R.C. § 163.  They were not subject to either section 162 or section 212.  *Compare* I.R.C. § 163 (pertaining to interest) *with* I.R.C. §§ 162 & 212 (not pertaining to interest).  Because we must not "add to or alter the words employed to effect a purpose which does not appear on the face of the statute," *Hanover Bank v. Commissioner,* 369 U.S. 672, 687, 82 S.Ct. 1080, 1089, 8 L.Ed.2d 187 (1962), we hold that, in the taxable year at issue, the timing restrictions of section 404 were inapplicable to interest deductions.

The legislative history of section 404 lends support to our conclusion.  There is absolutely no indication that Congress intended section 404 to apply to interest deductions.  Sec-

tion 404 was codified in its present form in 1954.  At that time, Congress was fully aware of the differences between the predecessors to sections 162 (trade or business expenses), 163 (interest), and 212 (production of income expenses) of the Code.  *See, e.g.,* H.R.Rep. No. 1337, 83d Cong., 2d Sess., *reprinted in* 1954 U.S.C.C.A.N. 4017, 4181 (discussing the relationship between the predecessors to sections 162, 163, and 212).  If Congress had intended section 404 to govern the timing of interest deductions, it could have made specific reference to the predecessor of section 163 as well.  *See, e.g.,* I.R.C. § 267 (1983) (explicitly referring to section 163 as well as sections 162 and 212).  To the contrary, the legislative history of section 404 mentions only "compensation."  *See, e.g.,* S.Rep. No. 1631, 77th Cong., 2d Sess. (1942), *reprinted in* 1942–2 Com.Bull. at 504, 607–09.  Accordingly, there is no indication in the legislative history of section 404 that Congress intended it to apply to interest.

The Commissioner argues that a 1986 "clarifying" amendment to section 404, which eliminated the references to sections 162 and 212 in order to make clear the broad scope of the statute, evidenced Congressional intent, *ab initio,* to include interest under that section.  We reject this argument.  According to the legislative history of the 1986 amendment, it is true that Congress intended to clarify section 404 to include all forms of *compensation* for services rendered.  However, there is insufficient indication that Congress intended to include anything *other* than *compensation.*  *See, e.g.,* S.Rep. No. 313, 99th Cong., 2d Sess. 1, 1013 (1986) (referring repeatedly to compensation).[21]  As we have noted, for DCA purposes, "compensation" and "interest" are two very different con-

---

**19.**  Most individuals are on the cash accounting system and thus would not include the income from their DCAs until it is paid to them in full.

**20.**  The relevant provisions were as follows:

(b) In order to be deductible under section 404(a), contributions must be expenses which would be deductible under section 162 (relating to trade or business expenses) or 212 (relating to expenses for production of income) if it were not for the provision in section 404(a) that they are deductible, if at all, only under section 404(a).  Contributions may therefore be deducted under section 404(a) *only* to the extent that they are ordinary and necessary expenses [incurred] dur-

ing the taxable year in carrying on the trade or business or for the production of income and are compensation for personal services actually rendered.
*Id.*

**21.**  The relevant provisions are as follows:

b.  Clarification of the scope of the deduction-timing rules applicable to *deferred compensation* arrangements....
    Explanation of Provision
The bill clarifies that the deduction-timing rules for *deferred compensation* arrangements apply to any plan or method of deferring *compensa-*

cepts. Accordingly, we reject the Commissioner's argument that the 1986 amendment evidenced an intent by Congress to include interest expenses under the timing restrictions of section 404.

■ Finally, the Commissioner argues that, notwithstanding the plain language of the statute, Congress must have intended to include interest expenses within the scope of section 404 because Congress enacted timing restrictions with respect to compensation expenses. We do not agree that simply because Congress determined to treat compensation in a particular manner it necessarily intended to treat interest in that same manner. Congress' decisions with respect to tax policy do not always fit a neat and logical pattern. Sometimes they are even influenced by less-than-objective forces. Still, we sympathize with the Commissioner's "policy" arguments regarding Congress' intent. It is quite possible that, had Congress considered this problem in 1942 and 1986, it would have modified the wording of section 404 to cover deductions for interest as well as for compensation. Permitting the deduction of interest may simply have resulted from a glitch in the Code. Even if that is the case, however, Code changes are for Congress to make—not the courts.

In sum, we hold that the timing restrictions of section 404 do not apply to expenses relating to interest that is paid pursuant to a DCA. Accordingly, Albertson's may properly deduct such expenses as they accrue, and we reverse the Tax Court on this issue.

### C. HVAC System Credits

1. *Background.* Prior to 1986, the Internal Revenue Code allowed a tax credit for a taxpayer's investment in certain types of property ("Section 38 Property"). *See* I.R.C. § 46 (1983).[22] In general, such property did not include "structural components" of buildings, such as central air conditioning or heating systems. *See* Treas.Reg. § 1.48–1(e)(2). A limited exception for such systems existed, however, if the "sole justification" for them was meeting the temperature and humidity requirements essential for the operation of other machinery. *See id.*[23] The owners of systems that qualified under the exception were able to claim investment tax credits for such property.

In 1985, Albertson's claimed investment tax credits for various heating, ventilating, and air conditioning ("HVAC") systems that it had installed in 33 of its supermarkets. Albertson's argued that it was entitled to the investment tax credits because the "sole justification" for such property was meeting the temperature and humidity requirements for Albertson's refrigerated cases and computerized checkout equipment. The Tax Court agreed and ruled in Albertson's favor. We reverse.

■ *2. Analysis.* The Commissioner argues that the Tax Court clearly erred in holding that the "sole justification" for Albertson's installation of its HVAC systems was the meeting of the temperature and humidity requirements for its other machinery. We agree. The Tax Court erred by failing to recognize that the HVAC systems were intended for and are used by Albertson's for two additional significant purposes: ventilation and customer comfort.

First, Albertson's HVAC systems play an important role in ventilating its supermar-

---

*tion* regardless of the section under which the amounts might otherwise be deductible and that the amount shall be deductible under section 404(a)(5) and shall not otherwise be deductible under any other section. This clarification is necessary to prevent taxpayers from asserting that *deferred compensation* is attributable to capitalizable compensation expenses [*e.g.*, under section 263A enacted in 1986] and, thereby, accelerate the timing of the deduction for such *deferred compensation.*
*Id.* (emphasis added).

**22.** The investment tax credit was repealed by section 211 of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085.

**23.** Treas.Reg. § 1.48–1(e)(2) provides as follows:

·[T]he term "structural components" does not include machinery the *sole justification* for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential.
*Id.* (emphasis added).

kets. The Tax Court completely failed to recognize this point. Albertson's HVAC systems provide a continuous supply of fresh air to its supermarkets. The systems also remove airborne bacteria, smoke, dirt, and stale odors. Because customer concerns about cleanliness are a top priority for supermarkets, Albertson's HVAC systems are crucial for attracting and retaining customers in a highly competitive market. Even Albertson's acknowledges that it is "certainly only good business practice" to ventilate its supermarkets. In light of these facts, we conclude that Albertson's HVAC systems play an important role in ventilating its supermarkets.

Second, HVAC systems clearly provide a comfortable shopping environment for Albertson's customers. The systems are set to 72°F all year round, which is well within the optimum comfort range for individuals of 68°F to 78°F. Given the broad geographical range of stores throughout Albertson's chain of supermarkets (Florida to Idaho), we find it impossible to say that air conditioning during the summer and heating during the winter does not result in a more comfortable shopping environment for the taxpayer's customers. This conclusion is supported by the fact that, during the 1950s, Albertson's had already installed HVAC systems in most of its supermarkets, well before it was aware of any interrelationship between HVAC systems and the proper functioning of its other equipment.

Given these facts, we conclude that it was clear error for the Tax Court to find that meeting the temperature and humidity requirements for other machinery was the "sole justification" for Albertson's installation of its HVAC systems.

■ Albertson's argues that customer comfort is a permissible exception to the "sole justification" test. That is, the HVAC systems are not disqualified even though they result in customer comfort. Specifically, Albertson's argues that the regulatory exception for *employee* comfort, *see* Treas. Reg. § 1.48–1(e)(2), is equally applicable to customer comfort. We decline to adopt Albertson's expansive reading of the regulation. First, the plain language of the regulations indicates that the comfort exception applies only to *employees;* the regulations make no reference to any other groups of individuals. Second, the example immediately following the regulation shows that the IRS intended the employee comfort exception to be a narrow one. *See id.* (giving the example of a factory—where there are no customers—instead of a retail store). Accordingly, we decline to import the concept of "customer" into the word "employee." [24]

In sum, because Albertson's HVAC systems clearly provide for ventilation and customer comfort, we reject its argument that the "sole justification" for such systems is maintaining the temperature and humidity requirements for its other machinery. Although such maintenance might very well be a *primary* reason for installing the HVAC systems, it is not the *only* significant one. Accordingly, the HVAC systems do not fall within the "sole justification" exception for central air conditioning or heating systems, *see* Treas.Reg. § 1.48–1(e)(2), and Albertson's is not eligible to claim tax credits for such property.[25]

## III. CONCLUSION

The judgment of the Tax Court is AFFIRMED in part and REVERSED in part.

---

**24.** Albertson's argues that a narrow reading of the "employee comfort" exception would result in the unavailability of the exception in any work environment in which inspectors, auditors, union stewards, and similar persons are present. We disagree. Our holding applies only to work environments in which *customers* are present. The IRS has stated that the occasional presence of other individuals would not result in a disqualification of the air conditioning equipment. We agree.

**25.** Albertson's also relies upon *Piggly Wiggly Southern, Inc. v. Commissioner,* 803 F.2d 1572 (11th Cir.1986), in which the Eleventh Circuit held that costs for a similar HVAC system qualified for an investment tax credit. We decline to follow the Eleventh Circuit's holding. Instead, we agree with the Court of Claims, which held that HVAC systems are not eligible for investment tax credit treatment. *See Publix Supermarkets, Inc. v. United States,* 26 Cl.Ct. 161 (1992).